## THE THESSALONIKI.[*]

### Appeal of NATIONAL STEAM NAVIGATION CO., LIMITED, OF GREECE.

(Circuit Court of Appeals, Second Circuit. August 11, 1920.)

**1. Shipping** ⬦209(3)—**Evidence held to show that water in vessel, which caused abandonment, came from outside.**

Evidence in proceeding to limit liability for loss of a vessel, with cargo and baggage, which showed that the vessel was abandoned after a quantity of water far greater than the contents of the boilers had entered the engine room during a storm, when the engines were stopped, *held* to show that the water entered from outside, not from the boilers, so that the loss was not due to unseaworthiness of the boilers.

**2. Shipping** ⬦207—**Abandonment when vessel was not past saving is error of navigation, for which liability may be limited.**

The abandonment of a vessel by her master and crew, when the vessel is not yet past saving, is an error of navigation, and management, for which the owners can limit their liability under the Harter Act (Comp. St. §§ 8029–8035).

**3. Shipping** ⬦209(3)—**Evidence held to show vessel was seaworthy.**

In proceeding to limit liability, evidence of inspections of the vessel and her rating and condition *held* to show that she was seaworthy when she started on her last voyage, and that her loss was caused by perils of the sea.

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 63, 65 L. Ed. —.

**4. Shipping ⊕═166 (1)—Steamship not insurer as to passengers; "ordinary care."**

A steamship company is not an insurer as to passengers on the vessel, but only liable for "ordinary care"; that is, care according to the circumstances, which in case of stormy and dangerous weather conditions is a very high degree of care.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ordinary Care.]

**5. Shipping ⊕═120, 167 (1)—Steamship not liable for loss of cargo and baggage, caused by excepted peril.**

A steamship company is an insurer as to the cargo and the passengers' baggage, unless the loss was brought within an exception of the bill of lading or passenger ticket.

**6. Shipping ⊕═209 (3)—Burden of proving negligence is on passenger or consignee.**

In proceeding to limit liability, the burden is on the passenger or consignee to prove negligence by the steamship company as the cause of loss of baggage or cargo.

**7. Shipping ⊕═207—Defects in boilers, which would only result in delay, do not render vessel unseaworthy.**

The only charges of unseaworthiness in the pleadings and proofs were connected with the boilers, engines, and sounding pipes. Assuming them all to be established, the only result would be a delay in the prosecution of the voyage, and the owners would not be liable, because the proximate cause of the loss of the vessel was a peril of the sea.

Appeal from the District Court of the United States for the Southern District of New York.

Petition by the National Steam Navigation Company, Limited, of Greece, owner of the steamship Thessaloniki, for limitation of liability. From a decree denying the petition, petitioner appeals. Reversed, with directions to enter a decree exonerating petitioner.

·John D. Stephanidis and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City (J. Parker Kirlin, Cletus Keating, and L. De Grove Potter, all of New York City, of counsel), for appellant.

Carter, Ledyard & Milburn, of New York City (Walter F. Taylor, and J. M. Richardson Lyeth, both of New York City, of counsel), for certain appealing claimants.

Harrington, Bigham & Englar, of New York City (D. Roger Englar and T. Catesby Jones, both of New York City, of counsel), for appellee and various other cargo claimants.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. This is an appeal from a decree of the District Court denying the petition of the National Steam Navigation Company, Limited, of Greece, owner of the steamer Thessaloniki, for limitation of liability, and at the same time claiming complete exoneration. The vessel was abandoned and sunk at sea January 6, 1916. Claims for personal injuries to passengers, and for loss of baggage and cargo, aggregating $976,075.98, have been filed with the commissioner. The opinion of the District Court is printed in the margin.[1]

The District Judge denied the petition to limit, and held the petitioner liable in full, on the ground that the steamer's boilers were in

[1] See note at end of case.

an unseaworthy condition at the beginning of the voyage, with the knowledge and privity of the petitioner, and that this was the cause of the abandonment of the vessel. He found as a fact that there was no proof of water coming into her from the outside at the time of abandonment, saying :

"The testimony of the witnesses for the claimants is much more satisfactory upon this point than that of the witnesses for petitioner; but, in any event, it may be said that petitioner has failed to demonstrate with satisfactory proof that waters came in through a broken porthole, or any other manner from the exterior of the ship, so as to cause damage to the engine and boiler equipment from any inrush from outside the ship. If any water did come in, it may fairly be assumed from the testimony that such water played no part, or, in any event, a very minor part, in disabling the vessel. The theory of loosened rivets and other theories more or less contradictory, advanced by the testimony on behalf of the petitioner, seem to be entitled to little consideration; whereas, the testimony reasonably supports the contention of claimants that the accumulation of water in the engine room was due to the failure of the pumps to do their work. There seems to be no doubt that the ordinary water circulating in an engine room of this character will accumulate in substantial quantities, if not continuously pumped out; obviously, when boilers are leaking continuously, the amount of water would be increased. The considerable amount of water which was in the engine room of the Thessaloniki when she was abandoned is easily explained by the leaking of the boilers and the failure to pump out the accumulated water."

There was abundant evidence that weather of most extraordinary violence was encountered for long periods between December 21st and January 5th (American calendar), when the vessel was abandoned. Certainly during the storm of December 21st water did appear in large quantities in the engine room and stoke hole, and we are convinced that it came through a broken porthole in the cross coal bunker. This water was pumped out when the place of the leak was covered, and all leaking ceased.

Shortly after midnight of January 4th, the steamer being then in tow of the steamer Patris, the towing lines broke after 36 hours of towing, and the Patris was lost sight of in a snowstorm. At 8 a. m. the chief engineer reported to the captain that water had been again appearing in the engine room and stoke hole. No water was found in the cargo holds. Although the engines were stopped, and all the steam was used on the pumps, they could do no more than keep the water from rising. The steamer was rolling in the trough of the sea, and on the morning of the 5th the water began to gain on the pumps, and at 4 p. m., with from 3 to 5 feet of water in the stoke hole, the fire in the lower furnaces put out, the officers and crew, with only the clothes they stood in and what they could carry in their hands, abandoned the vessel and went aboard the steamer Perugia, which had arrived about 3 p. m. in answer to an S. O. S. wireless call sent out on the morning of the 4th.

[1] It is said that the cause of the presence of water in the second storm is purely conjectural; but we think the evidence is irresistible that it came through the bottom of the vessel. It is neither necessary nor possible to locate the place and character of the leak precisely. The water could not have continued to rise from the accumulation of cooling water, because the engines were stopped and all steam used for the pumps. It could not have come from the boilers, because

the only leaks proved were at the ends of the tubes in the back tube plates, sufficient to reduce the steam power, but not to put out the fires. Moreover, the tubes found to be leaking, comparatively few in number, were plugged. If water had been leaking wholesale from the boilers, all danger would have been prevented by letting them empty their whole contents into the bilges. The highest estimate of their contents is 40 tons each, or 160 tons for the four boilers, whereas it would take 400 tons to reach the floor of the stoke hole, and 600 tons to reach the floor of the engine room.

[2] We think it quite incredible that a valuable steamer and cargo would have been abandoned within 300 miles of New York, if they were not past saving. However, had this been the case, it would have been an error in the navigation and management of the vessel, for which the owners would not be liable under the Harter Act (Comp. St. §§ 8029–8035), if they had exercised due diligence to make her seaworthy.

[3] The only charges of unseaworthiness in the pleadings and in the proofs are connected with the boilers, engines, and sounding pipes. We may assume them all to be established, and the only result would be delay in the prosecution of the voyage. As to the sounding pipes, we are quite satisfied that they were properly equipped with roses, which doubtless were more or less clogged by small particles of coal carried from the cross coal bunker through which the water came.

In respect to the hull, the proof is that the vessel was of most substantial construction, in excess of Lloyd's requirements; that at the time of abandonment she had the classification of the British Corporation, which is but one, and of the highest class; that the hull was examined in dry dock in July, 1913, by the marine superintendent of the Ellerman Line, the owner, and in August by the inspector of the British Corporation, and found in good condition; in April, 1915, the hull was passed on the annual inspection by the United States inspector at New York as in good condition, and the vessel's certificate as a passenger steamer continued; in September, 1915, the hull was again examined in dry dock at New York; and in November, 1915, at Piræus. This seems to us to afford abundant evidence of seaworthiness and we find that the proximate cause of the loss was peril of the sea.

[4-6] The steamship company was not an insurer as to the passengers, but only liable for ordinary care; that is, care according to the circumstances, in this case a very high degree of care. As to the cargo and passengers' baggage, it was an insurer; but, if the loss was brought within an exception of the bill of lading or of the passenger ticket, proof that the carrier was guilty of negligence lies upon the shipper or consignee and the passenger.

[7] The passenger tickets did exempt the company from liability for damage resulting from storm, and in general from all accidents on the sea, and the bills of lading exempted the carrier from liability for loss occasioned by the act of God, perils of the sea, or other accidents of navigation. The company, having proved a peril of the sea as the proximate and adequate cause of the loss, is entitled to complete

exoneration. If the claimants had filed libels in the court below, their libels should have been dismissed.

The decree is reversed, and the court below directed to enter a decree exonerating the petitioner appellant, with costs of this court, but, under the circumstances, without costs of the District Court.

NOTE.—The following is the opinion of Mayer, District Judge, referred to in the opinion above:

MAYER, District Judge. Petitioner has brought this proceeding to limit its liability as owner of the Thessaloniki, which was abandoned at sea on January 5, 1916, and presumably sank. A cargo of substantial value was lost, but there was no loss of life. Petitioner denies liability, and alleges that, if any liability exists, it arose without the knowledge or privity of petitioner.

The Thessaloniki was built for the Ellerman Line in 1890 at Belfast, and was originally the British vessel City of Vienna. In November, 1913, she was sold to petitioner, her name was changed to Thessaloniki, and thereafter she sailed under the Greek flag. She had the highest class in the British Corporation which she kept until the time of her loss. She was well built, in excess of Lloyd's requirements, and was maintained in good repair while operated by the Ellerman Line. She was a steel screw steamer of 2,895 net tonnage, deadweight capacity 6,500 tons, 412.3 feet long, 46.7 feet beam, 29.3 feet depth of hold. She had four holds, two aft and two forward of the engine room, and underneath these and the engine compartment there were six tanks, of 45 tons capacity each, for water. She was equipped with a triple expansion engine, having one high-pressure, one intermediate, and one low-pressure cylinder. The indicated horse power of her engines was 3,200, and, according to Constanditis, her chief engineer, these engines were the largest of any Greek merchant vessel. The engines normally made 56 to 58 revolutions per minute light, and about 54 loaded, which gave the ship a speed of from 10 to 10½ miles per hour.

At the outset, petitioner is faced with the burden of showing that the loss of the vessel "was occasioned by one of the perils for which he was not responsible." Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; The Folmina, 212 U. S. 354, 361, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748. Under the Harter Act, the shipowner "must prove that the vessel was seaworthy at the time of beginning the voyage or that due diligence had been used to make her so." The Wildcroft, 201 U. S. 378, 386, 26 Sup. Ct. 467, 50 L. Ed. 794.

Claimants urge (1) that petitioner has not succeeded in explaining the loss of the steamer, or assigning a cause intelligible from or supported by the testimony; and (2) that the proximate cause of the loss was the defective condition of the boilers—a condition which, claimants assert, must have existed before the Thessaloniki left Greece on her last voyage, and could not have arisen because of acts done or occurrences on the voyage itself. As might be expected, there is a sharp conflict of testimony in regard to this vital point of the condition of the boilers; but dehors the words of witnesses there are some undisputed facts which are of service in arriving at a conclusion. In addition, in this case, the expert testimony has been of real service in presenting clearly the two different theories as to the boiler condition and action which the contending parties advance.

On November 16, 1915,[2] the Thessaloniki sailed from Piræus, Greece, bound for New York. She stopped at Calamata, Patras, Messina, and Algiers, passing Gibraltar on December 1st. According to her normal rate of full speed, she should have arrived in New York by about December 16th. On December 21st, however, she was still about 600 miles from New York. After various experiences, to be referred to infra, the vessel on December 30th, was

—————

[2] The dates are given according to the American calendar, which is 13 days later than the Greek dates used in the log book.

about 300 miles from New York and finally, on January 5th, the steamer was abandoned by her crew, whose members were taken aboard the Perugia and thus conveyed to New York.

In accounting for the loss of the steamer, the position of petitioner is thus stated by its counsel, in their brief: "The evidence taken in the case and the records of the weather bureau show that the Thessaloniki met rough weather, high seas, and adverse winds almost continuously during the entire voyage, that the speed of the vessel was greatly retarded, and that on and after December 21st she encountered four cyclones and weather of extraordinary violence. These perils caused damage to the vessel's equipment and machinery, and a leak, apparently beneath the cross bunkers, which admitted water in such large quantities as to require the abandonment of the vessel. * * * It is contended on behalf of the petitioner that the slow speed of the vessel, the breakdown of the boilers, and the eventual loss of the ship were all due to the sea perils encountered on the voyage. As a matter of fact, the speed and the condition of the boilers were immaterial, as the loss of the vessel was proximately caused by the leak in the vessel, and was not in any way due to the condition of the boilers, three of which had been cleaned and repaired and were in working order when the vessel was abandoned."

We are thus led to inquire (1) as to weather conditions; (2) as to the leak, if any; and (3) as to the boiler condition during and before the voyage.

(1) The Weather.—Up to December 21st the weather was no different than that which might be expected on the Atlantic in November and December of any year. The best guide in particular is the captain's log, and a general guide is the testimony of Mr. Kimball, meteorologist of the United States Weather Bureau. There is also the diary of Peaskee, the ship's doctor, who reveals himself as rather an apprehensive and amusing person; but, while the doctor (who, for the purposes of this case, must be regarded as a landsman) clearly indicated that his fears were seldom absent, yet, because his descriptions cannot be regarded as the accurate statements of a trained navigator, they must be disregarded.

It is, of course, a matter of common knowledge that weather is described with different adjectives, dependent partly on impression, partly on use of language, and partly on experience, and thus two persons may mean the same condition, when one speaks of a "violent" wind and the other of a "strong" wind. It is therefore highly helpful, when a description may be read in the light of a standard, and this can be done in the case of the log of Capt. Goulandris and the skilled interpretation of Mr. Kimball.

The captain used eight words to indicate wind forces; i. e.: (1) Calm; (2) little wind; (3) moderate wind; (4) much wind; (5) strong wind; (6) violent wind; (7) gale; and (8) cyclone. Remembering this ascending nomenclature, it will be at once appreciated that "strong wind, with rough sea"—an entry which frequently appears prior to December 21st—means little of serious import; nor can any significance be attached to such an entry as that made at Calamata, when the log records, "Owing to the rough sea, three barrels of sugar fell into the lighter and were broken." The ocean in the late fall or early winter is not an inland summer stream, and much worse conditions may be found in the harbor on a windy wintry day.

A detailed examination of the log, the testimony of the captain himself, the petition of the petitioner, and the accounts, among others, of First Officer Orloff, Second Officer Piankes, and Third Officer Roonomides, show that the weather, prior to December 21st, was not in any sense unusual, nor of a character to damage a vessel which, on November 16th, sailed with a stout hull. Further, the records of Mr. Kimball showed that no vessels anywhere near the same general vicinity as the Thessaloniki reported any wind force in excess of No. 6 on the Beaufort scale—a strong breeze—prior to December 26th. It is true that Mr. Kimball thought, on a theoretical basis, that stronger winds might have been encountered, the most severe being force 9—a strong gale—on December 11th and 12th; but, even assuming

this, his testimony showed, generally speaking, that the weather conditions prior to December 21st were not unusual for that time of year, indeed better than the theretofore average experience.

There was a good deal of speculative suggestion, which dealt with isobars and the like, which may at once be laid aside. Such deductions as may be drawn from an expert consideration of this kind may be useful in the scientific progress of weather forecasting—not as yet an exact science—but are unsteady service in determining the precise weather condition on a certain date at a particular place. Indeed, it is a matter of common experience that within a short distance of a light breeze there may be a considerable wind, or that it may be raining uptown and clear downtown.

On December 21st, the log records: "Hurricane, ungovernable, violent. windstorm; * * * wind became most violent as well as the sea."

This severe weather, however, continued for less than 24 hours and no damage was sustained. However a considerable amount of water collected in the engine room and the Captain called a meeting of the officers and engineers and "it was decided on account of the ship's condition to call for help SS 'Stampalia' the nearest to us; and immediately she steamed to us. We are also steaming hard to meet her."

The "Stampalia" approached and, says the log, "We pumped all the waters out. * * * We inspected the double bottoms to see whether the waters are entering again but we found them dry. After that we inspected all the holds and coal bunkers. In a bunker we found a port hole broken from which the waters came in."

At 4 A. M., on December 23d, the Thessaloniki, convoyed by the "Stampalia" encountered only a "light wind with swelling of the sea" and at 8:30 A. M., "after a conference held by the Captain and officers and the engineers, seeing that there is no danger, we decided to leave the steamer free to continue her journey and we continued our journey alone." Thereupon, the "Stampalia" was dismissed and the "Thessaloniki" proceeded only 324 miles or about 4½ knots per hour until December 26th, although during these three days there were only about twelve hours of bad weather; i. e., from "violent wind with big rough sea," to "very strong wind with big rough sea." On December 26th the vessel encountered a very severe storm, described at 8 A. M. as "the weather became stormy" and at noon as "hurricane continues with more rage and waves rushing violently on deck." By midnight the "weather was considerably improved." "A high wave broke on the deck and caused much damage to the bridge and the deck, a boat was taken away * * * another wave smashed two of our boats and caused such other damage on the deck."

On December 27th "the weather being improved, we continued our journey." On December 28th, some of the officers, without the Captain's consent, sent out distress signals by wireless, "although" the Captain recorded in the log, "there was no immediate danger." On December 29th, sails were rigged up on both masts. About 7 P. M. "the wind became most violent and changed to a hurricane" and at midnight, "the hurricane" continued "with the same rage."

On the morning of December 30th, distress signals were sent out by common consent, the steamer then being about 300 miles from New York. On December 28th, the 2 p. m. log entry showed "a boiler was emptied for repairing and cleaning its tubes which were losing" and at midnight "we still proceed, with the cleaning and repairing of the boiler." On the morning of December 29th, the "cleaned boiler was put in use" but later in the morning "another boiler was emptied for cleaning." Later, the "cleaning of the boiler ended and was used."

The entry as of noon December 30th stated, "The engineer informed us that the boilers sustained injury, as result of which we are proceeding slowly." At the time the revenue cutter Seneca and the British steamer Florizel were approaching to assist, and while awaiting them, "we stopped the engine, and we are endeavoring to repair and clean the boilers."

On December 31st, the work on the boilers being completed, the Thessaloniki's engines could be moved slowly. At this time the Greek steamer Patris,

a ship of the same line as the Thessaloniki, had joined the group of vessels which were coming to the Thessaloniki's assistance. The Florizel came in sight at 5 p. m. on this date, and the Patris at 10:45 p. m. Upon the arrival of the Patris, the master of the Thessaloniki dismissed the Florizel, which was still standing by, and the revenue cutter Seneca, which had not yet come in sight, and on the following morning, January 1st, the passengers of the Thessaloniki were transferred in small boats to the Patris, which then put a tow line on the Thessaloniki and endeavored to tow her to New York. The towing lines parted from time to time, but the towing operations continued with occasional interruptions from the morning of January 1st until about midnight between January 3d and 4th. On January 2d the Thessaloniki sought the assistance of the Dutch seamer Procion, asking her if she would tow the Thessaloniki in case the Patris failed, but the Procion declined.

Shortly after midnight, between January 3d and 4th, the tow line having broken, the Patris was lost to view in a blizzard. Some water having been found in the engine room, the Thessaloniki again sent out urgent distress signals, to which a number of steamers responded, including the Danish steamer United States, and the British steamer Perugia. By this time the distress signals from the Thessaloniki seem to have become a habit, and the Thessaloniki was wallowing in the sea, while other vessels such as the Stampalia, were going to and coming from New York.

Finally, on January 5th, the Perugia came up and the crew of the Thessaloniki abandoned her and came to New York on the Perugia.

To recapitulate: There was really no bad weather until December 21st. That storm lasted less than 24 hours, and the next severe storm did not occur until December 26th.

(2). The Leak.—Shortly after the arrival of the crew of the Thessaloniki in New York, a libel was filed in this court on behalf of a passenger named Williams. Several witnesses were examined de bene esse on behalf of libelant. Such testimony is usually important and useful. Ordinarily it is given at a time when witnesses do not fully see the purpose of the examiner's questions, and when memory is not affected by lapse of time nor partisan leaning.

First Officer Orloff testified that he first thought the steamer was in danger, on the occasion of the first storm (December 21st), "because of the appearance of water which the pump could not pump out quickly." This water appeared in the coal bunker and also in the boiler room. The engineers told Orloff about the water, and when he first heard it he "went downstairs to see," and found "there was much water also in the coal bunkers and in the boiler rooms." An investigation was therefore made, apparently of a thorough character. "We looked," testified Orloff, "at all the port holes to see if any of them were broken; very little water used to come through the port holes, but not so much as to fill up the quantity of water that was in the boat; then we looked at the cargo holds, particularly No. 1 and 2, fearing that water was coming in from that section; because the water was so much in that region we made a special investigation of that section. Q. Could you find out how water came into the ship? A. No."

Bernardos, a fireman or coal passer, testified that he did not see any hole where the water could come in. Piankos, the second officer, testified that there was no water in the cargo holds, and he accounted for the water on grounds other than entry from the exterior of the ship. Hatjoglou, oiler, and Caristinos, donkeyman, both witnesses at the trial, and Peremenis and Korteses, firemen, examined in New York by deposition, all testified, in effect, that the accumulation of water in the engine room was due to the fact that the pumps would not work, and not due to any water coming in from the outside of the vessel. On the other hand, Stylidiadas, second engineer, testified that the vessel became unmanageable on account of rough weather after the time that the towing lines of the Patris broke. The exact date to which Stylidiadas refers is not clear, but this incident seems to have occurred on January 1st. Stylidiadas said that, "after the lapse of three or four hours, waters appeared in the cross bunker" and "ran down to the boiler room

and the engine room." But he failed to state how the water got into the bunker.

Constanditis testified that the Patris towline broke three times, and after the last break "large quantities of water got into the boiler room, bunker and engine room"; but he does not satisfactorily account for the presence of the water. Captain Goulandris testified that, after the chain broke, he and the carpenter sounded to see if there was water in the holds, and found all the holds dry, but saw water in the boiler room and coal bunker and engine room, and surmised "that the waters were coming from the bunker, because they appeared there before." He stated: "I went into the coal bunkers and inspected the empty space of the coal bunkers; I looked up on the roof to see if there was any hole. I did not discover any, but the water was coming, and I saw the water was coming in from the coal; as the coal was in there. I could not see where the water was coming from." He was then asked whether the water was coming from below, and he answered: "Yes; my explanation of this was, as I could not discover any other place, that the water was coming from below, and I surmised that the hold must have gotten loose down below; that a rivet or rivets got loose."

Economides, third officer, testified that he went on watch at midnight on January 3d; that the towline broke and the ship became unmanageable; that at about 3 o'clock in the morning the engineer came up and notified him that there was water in the engine room, and that, although they kept pumping the waters all the time, the waters were increasing; but it is impossible to find in his testimony any clear statement as to how the water got into the vessel.

The testimony of the witnesses for claimants is much more satisfactory upon this point than that of the witnesses for petitioner; but, in any event, it may be said that petitioner has failed to demonstrate with satisfactory proof that waters came in through a broken port hole or any other manner from the exterior of the ship, so as to cause damage to the engine and boiler equipment from any inrush from outside the ship. If any water did come in, it may fairly be assumed from the testimony that such water played no part, or, in any event, a very minor part, in disabling the vessel. The theory of loosened rivets, and other theories more or less contradictory, advanced by the testimony on behalf of petitioner, seem to be entitled to little consideration; whereas, the testimony reasonably supports the contention of claimants that the accumulation of water in the engine room was due to the failure of the pumps to do their work. There seems to be no doubt that the ordinary water circulating in an engine room of this character will accumulate in substantial quantities if not continuously pumped out, and obviously, when boilers are leaking continuously, the amount of water would be increased. The considerable amount of water which was in the engine room of the Thessaloniki when she was abandoned is easily explained by the leaking of the boilers and the failure to pump out the accumulated water.

(3) The Boilers.—The testimony having excluded the hypothesis as to a leak of some kind as the proximate cause of the condition of the ship, and all agreeing that the damage done by the storms had no effect on the hull so far as the locomotion or progress of the vessel was concerned, there is no escape from the conclusion that the situation in which the vessel found itself was due to some defect of the boilers. Contradictory, and in some instances rather absurd, explanations are attempted by some of the officers of the vessel to account for the disaster; but one cannot perform the task of reading these many pages of testimony without concluding that the proximate cause of the loss of the vessel was some boiler condition. The question, then, is whether that condition existed when the Thessaloniki left Piræus or occurred during the voyage. Ordinarily, the testimony first, and expert testimony second; but, in this case, it will be helpful to examine first the theories and explanations of the experts, and then see how the testimony fits these theories and explanations.

Each side had two experts, all men of high character and acknowledged equipment. Messrs. McNaught and Haight, experts for the claimants, had,

however, the advantage over Messrs. Martin and Ross, experts for petitioner, in that both Mr. McNaught and Mr. Haight had had actual sea experience. It is no reflection upon the ability of Messrs. Haight, Martin, and Ross, who are well and favorably known to the court, to state that Mr. McNaught, for the purposes of this case, was one of the most impressive and convincing experts to whom I have ever listened. In addition to a clear understanding of the subject-matter, and a trained technical appreciation of the questions involved, Mr. McNaught has had the great advantage of a long and varied active experience in the engine room, having served as chief engineer on ships for many years, and having been practically all over the world in that capacity. Such an experience, when an expert is both upright and intelligent, is of great service in resolving any questions of doubt, because it is well known, and especially at sea, that theory and practice do not always accord. The theory of Mr. Martin, briefly stated, was that a boiler could be seriously damaged merely through the entrance of cold air into the furnaces during bad firing incident to rough weather, and that this result might occur, though firemen did their duty as best they could in the circumstances. This theory was theory pure and simple, unsupported by even the hearsay talk as to vessels which had thus suffered.

Mr. Ross expressed the view, in substance, that unequal expansion in the boiler tends to cause leaky tubes, and that such inequality of expansion is much more likely to occur where there is a deposit of scale on the outside of the tubes. He referred, as a precedent, to a paper read by Mr. Howden in 1886; but nothing in this paper is inconsistent with the contention of claimants, or the theory of their experts, for the paper concludes as follows: "This conclusion is indeed not left to mere inference—it is a fact within the experience of most sea-going engineers working with chimney drafts that, when considerable scale accumulates on a back tube plate of an ordinary marine boiler, if a furnace door is suddenly opened under certain conditions of draft, the rush of cold air causes the tubes to leak."

It is not contended that, when tubes are covered with scale, they will not be likely to begin to leak, and that this tendency will be increased by inequality of firing. The leaking of tubes was the grave problem in the early days of marine boilers, and the constant effort has been to eliminate this difficulty, and that effort has been fairly attained. Rough weather is to be expected during many periods of the year, and may occur at any time, and, with rough weather, inequality of firing may be expected; but, if the theory of petitioner's experts is to be accepted, then Scotch boilers (as were those on the Thessaloniki) must be regarded as a failure, and as yet marine engineers do not thus unhappily classify this widely used standard equipment. Both Mr. McNaught and Mr. Haight, in answer to the hypothetical question, stated that the condition of the boilers as they existed on December 27th and 28th (upon the assumption of the fact stated in the question) could not have been brought about by the events of the voyage. In other words, their testimony comes down to the proposition that the boilers could not have been completely and properly cleaned when the vessel started on its voyage.

It is impracticable to discuss in detail the testimony of the experts and the numerous possible conditions which necessarily were discussed in seeking for an adequate explanation of the boiler condition, and the details as to the condenser, the thinning out of the tubes, and the plugging, must be ascertained by a perusal of the testimony; but the following extract from Mr. McNaught's testimony sets forth, in simple language, what very well may happen if this important part of a ship's equipment is not jealously watched and dealt with.

"By the Court: Q. Right on that subject, just give me briefly the kind of conduct of an engineer which would tend to impair or perhaps destroy the efficiency of the tubes. A. Well, picture, your honor, a ship brand new, an average ship, with a careless engineer, going to sea in her. He allows his boilers to become salt through negligence in not working his evaporator, which is frequently done; in turn, his boilers become extremely dirty and foul, due to the deposit of salt water which he has allowed to go into his boilers. He makes a voyage, and when he empties his boilers, instead of examining them

carefully, having all the heated surfaces cleaned of the scale which has been deposited, the scale is allowed to remain, except in palpable places, such as the top of the furnace, or the tube plate, or tube sheet, which is a very vital part and should be carefully attended to. If allowed to gather its accumulation of scale, after a period possibly of 12 months, he will immediately begin to have trouble with his tube ends, where they go through the back tube ends, due to the overheating of the tube sheet itself and the unequal expansion in the tubes; the tubes become coated with so much scale that when the fires are bright and clean, and the boilers working well, the conduction of the tubes is such as to allow the tubes to become overheated, because the scale prevents the heat from being conducted through the tubes to the water. The tubes expand more than the rest of the boilers, which causes, of course, a slight shifting of the tube where it is expanded in the back tube sheet, due to the expansion, and unfortunately causes serious leaks. These leaks continue, and the engineer or the shore people, as the case may be, go into the boilers and put in the tube expander and again expand the tube. The process of expanding the tube is a thinning of the tube or an expansion of the tube; so that each time—I have seen a tube expanded in the back connection and cut through just by expanding—that is the resistance of the tube plate to the expanding of the tube; so that this scale remains on the tube sheet, and these leaks occur several times, and the tube is several times expanded, until you reach a condition where it is practically impossible to continue working the boilers."

There is much in the testimony which tends to expose the facts upon the assumption of which Mr. McNaught and Mr. Haight expressed their opinions and based their conclusions (Koufos, Raftopoulos, Vourloumis, Hatjoglou, Peremenis, Caristinos, and Kortesis). Some of this testimony comes from humble men, and some of it is marked by inaccuracies and contradictions. But nevertheless the impression is left that something was wrong with the boilers. The picture is one of testimony adduced by both sides, each at times disclosing details which are inconsistent and occasionally grotesque. It is impracticable to analyze this testimony, witness by witness; but, when it is all done with, it is difficult to eliminate the impression, supra, that the boilers were not in proper condition when the vessel left Piræus, and it certainly is very hard to account for the tardy progress of the voyage prior to December 21st on any other theory.

Thus against considerable fact testimony, and against the clear and logical explanation of claimants' experts, there is opposed really only the direct testimony of the chief engineer, Constanditis, and of the marine surveyor, Alexander Kairis. Stylidiadas, second engineer, and Demeterios Kairis and Andrieoplues, third engineers, merely gave general testimony to the effect that the boilers were in good condition when the vessel left Piræus. Ceconomopoulis, the contractor who was employed to clean the boilers at Piræus, testified merely to having cleaned the boilers in the same way that he always cleaned boilers. Direct testimony, involving visual inspection, comes down to that given by Constanditis and Alexander Kairis.

As affecting the testimony of Constanditis, the case presents two rather unusual circumstances. The deck officers kept a scrap log, as well as the official deck log, while an engine room log was kept under the supervision of the chief engineer. Of these three logs only the official deck log (from which quotations have been extracted, supra), was produced. In the Williams Case, almost at the commencement of the examination of Cap. Goulandris, counsel for claimants called for the log book, which was not then produced, because said to be in possession of the Greek consul. On the subsequent examination of Goulandris, at a later date, he produced the log. When Orloff, the first officer, was examined, he said, "My scrap book (meaning scrap log) the captain has, and the log book shows the exact position." Counsel then called for the production of the scrap log book, whereupon counsel for petitioner stated, "If the captain has it, I will produce it; I can't say whether he has it or not."

In the course of the examination of Orloff, he was asked when he first had trouble with the boilers, and he answered, "I don't remember exactly, but, if you wish me, I can refer to the log book, because I know we stopped one day to clean up certain tubes of a boiler." He then looked at the log book and answered, "There is no entry in the log book; I remember very well, as we stopped to clean up the tubes of the boiler." Later he was asked whether there was an entry in the ship's scrap log book showing the date when the vessel stopped to clean up the boiler, and he answered, "Yes; I made an entry, as well as the other mates; the captain has it; I had all my entries there." Counsel for claimants again called for production of the scrap book, and a little later repeated his request. According to Orloff, the captain took the scrap book, and had it on the Perugia, and when Orloff was further questioned, he answered: "Because the scrap log book contains every movement of the ship, we cannot do otherwise than make every entry in that scrap log book; I don't know if that entry appears in the present log book." At a later date, when Orloff was further examined, counsel for petitioner insisted that there was only one log book kept on board the ship. As he put it: "That is the captain's version; * * * the captain says there is no scrap log book."

Undoubtedly counsel was stating what had been told to him, but the evidence is convincing that there was a scrap log book, and the excuse for its nonproduction is that it was so wet that the captain did not think it worth taking off the vessel. Some of the witnesses testified that they saw the scrap log on the Perugia, where it was being used in writing up the official deck log.

It is well known, as Orloff indicated, that the scrap log often contains a considerable amount of detail, which, sometimes, is not fully transcribed into the official log, and therefore, when important questions of fact arise, as in the case at bar, there is no assurance, necessarily, that the official log contains all that was written in the scrap log, and, if Orloff is to be believed, at least one instance has been quoted where there was the failure to enter in the official log an important experience in connection with the boilers which, according to Orloff's recollection, had been entered in the scrap log. In addition, the chief engineer's log disappeared in a manner which is inherently peculiar. The one record which a seafaring man holds onto is the log. If he has truly recorded the events of a voyage, he knows that the log may be of vital importance in acquitting him of blame, and, if the testimony heard in many litigations is any guide, it may safely be asserted that a conscientious officer will do everything in his power to preserve the log, even though it be water-soaked.

The chief engineer Constanditis, admitted that he took the log with him aboard the Perugia; that it was stolen from him, but later found in such a mutilated condition that he did not consider it worth preserving. It is hard to assign any reason which any one could have for stealing or mutilating the engineer's log book, and it is interesting to note that the officers took good care to preserve their certificates and other documents, as well as the mails and bags containing their personal effects.

The conclusion is irresistible that there was something in one or both of these log books, and particularly in the log book of the chief engineer, which made their loss desirable from the point of view of those who kept these books and were charged with their custody. It is not too much to say that it may fairly be assumed that an officer will preserve even the most mutilated record of this kind in the hope that, perhaps, some of its entries may be restored, or, in any event, that the officer may be able to exhibit what he has, and thus satisfy the inquiry as to his good faith. This serious circumstance, together with other testimony of Constanditis, in which he attempts to explain the actions of and results in the boiler and engine rooms, combine to destroy, or in any event seriously impair, his testimony as to the condition of the boilers when the vessel left Piræus. It must not be forgotten that, if the boilers were not in good condition, such a situation would lay a heavy burden upon the chief engineer, and might readily affect his future as a re-

sponsible man, even though the bad condition of the boilers was due to the haste of his employers or to some other reason.

In respect of Kairis, the situation is one of exceeding delicacy. He is undoubtedly a capable man, and has been in the employ of responsible concerns, and there has been confided to him the performance of highly important duties. To say positively that either he or Constanditis have not told the truth upon a vital point might, if the court is wrong, do a lasting injustice to men who have led industrious and honorable lives. Therefore I shall content myself by stating that the testimony of Kairis was not convincing. He was greatly confused as to dates and events when asked about a collateral matter, in an examination designed to test his credibility.

It is urged that his memory as to the drydocking of the Thessaloniki was searched upon a point immaterial to the issues. This contention is sound so far as affects the question of fact as to the condition of the boilers, but it is unsound so far as affects credibility. A lay witness is not always keen to realize the purpose and effect of an examination or cross-examination, and very often what seems to be a collateral inquiry proves highly useful in determining the credence which is to be given to testimony. A witness may think that the inquiry is important and material, and may seek to escape what he conjures in his mind may be the consequence of answers along a given line, and, when a witness is as confused and mistaken as Kairis was upon this point, it is difficult for the court to be satisfied or convinced that his recollection in respect of important occurrences may be relied upon.

Perhaps, therefore, the most agreeable way of putting the matter is to say that the testimony adduced by petitioner as to the condition of the boilers when the vessel left Piræus is so seriously contradicted by other direct testimony as to the condition of the boilers during the voyage, by the slow progress of the vessel up to December 21st, by the detailed history of the conduct and movements of the vessel and the actions of the boilers from the time difficulty was discovered until the end of the voyage, and, finally, and by the reasonable and logical opinions of the experts for claimants, that the result must be reached that the boilers were dirty and in bad condition and unfit for the voyage when the Thessaloniki left Piræus.

In reaching this conclusion, I have not overlooked the previous experiences of the vessel, such as that at Bermuda, and the hydrostatic test made by the United States local inspectors. The only one of these previous experiences which needs comment is that of the inspection by the United States officials. That such a test does not destroy claimants' contention is, I think, distinctly disposed of by the statement of Mr. McNaught, as follows:

"The hydrostatic test is a means of preventing serious accidents, but is not by any means reliable as proving the machine, or the boiler, rather, to be efficient under steam. I have known of a hydrostatic test, in which a series of stays broke under the additional pressure, and the men in charge were not careful enough to examine the boilers after the test, and the boilers had gone under steam, and that part had lost its stay, through the nine stays bulging out six inches from the flat plate, proving that, although the nine stays remained externally tight, when the heat came onto it, it bulged under the strain with a less pressure." (See also Haight's testimony.)

Concluding, therefore, that negligence must be imputed to the petitioner, the final and exceedingly difficult question is that of petitioner's privity or knowledge. The solution of this question rests in great measure upon the duties imposed upon or practiced by Alexander Kairis and Maris Embericos and their relation to petitioner. Embericos was the managing director of petitioner, and had the supervision of its ships, and, generally, of all its naval matters. Kairis was a consulting marine engineer in general practice at Athens. He was also employed to perform certain services in connection with petitioner's ships. On this point Kairis testified, when examined in Greece, as follows:

"A. When the ship arrives in Piræus, at the National Steam Navigation Company, the captain and engineers report to the company, and then Capt. Maris Embiricos will call me and give me the list to go on board and in-

spect all these repairs, inspect if there is any more repairs required on the ship, and I call the shop man° on the ship, and we arrange the repairs there. * * *

"Q. You were prepared to hear from the engineers, or be notified by the engineers, of any specific conditions on the ship, were you? A. The engineers; when anything happens, they tell me.

"Q. That is, if there is any specific condition? A. What do you mean, specific?

"Q. Any special condition of the ship that they want to invite your attention to, they do so? It may be the chief engineer or one of the subordinates? A. You know the engineers of the ship notify the company. Then Capt. Embiricos, manager, he calls me and sends me on the ship to examine this.

"Q. And when you are on the ship, it may be that you from time to time see reason to discuss with the engineers the condition of the ship? A. Yes.

"Q. The engine department? A. Yes.

"Q. The boiler department? A. Yes.

"Q. Everything? A. Yes.

"Q. As the result of the inspection that you made at this particular time, just a few days previous to her departure from Piræus, you saw the chief engineer of the ship, and some of the engineers of the ship, did you not? A. The chief engineer. I have nothing to do with the other engineers. I call always the chief engineer. I have nothing to do with the other engineers.

"Q. They are present, are they not? A. Yes.

"Q. But you discussed it with the chief engineer? A. Yes. * * *

"Q. Now, then, what repairs did you do to the ship before she sailed from Piræus to Salonica and Kavalla? A. I will bring you to-morrow the list.

"Q. Will you tell me now, from the best of your recollection? A. In Piræus my work is very large, and here I cannot remember all the particulars—so many I can't remember; but to-morrow, if you like, we will send somebody and take from the office. * * *

"Q. I ask you now, sir, as chief engineer of this line, and consulting engineer of this line, to tell me what repairs were made on the ship at the time you just referred to, at the time she sailed from Piræus to Salonica and Kavalla? A. I will bring you to-morrow the paper. That is all about it.

"Q. Give us an idea? A. I don't remember, you know.

"Q. Have you no idea? A. I can't remember.

"Q. Nothing about it? A. I can't remember the repairs. I will give you to-morrow the list. * * *

"Q. What repairs did you recommend at that time? Not what repairs were made, but what repairs you recommended at that time? A. The chief engineer makes a list of what repairs are required, and when the ship is here Capt. Embiricos sends me on board the ship to examine the repairs. After I decide if these repairs are necessary, I call the engine maker, and we arrange it to be done. If you like, this time, now we can go in the office. The papers are ready there. * * *

"Q. Of your independent recollection, now, you can testify to nothing concerning any repairs that you recommended to this ship the last day preceding the voyage on which she was lost? A. Haven't I already stated once; no?

"Q. Do you keep a copy of all your surveys and other statements and recommendations regarding repairs in your own office? * * * A. For the big work only; for the big service only; not for the small service.

"Q. Did you keep in your own private files a copy of any survey or recommendation that you made with reference to repairs on this ship at the time that you referred to just now? A. No; only the list mentioned it. The list mentioned it, which is given to the repairer who returned it with the account, and it is put in the files of the company.

"Q. Who prepares the list? A. The list is prepared by the first engineer, and I go and sanction it.

"Q. Did you sign it? A. No.

"Q. Did the chief engineer sign it? A. No; he doesn't either sign it. It only mentions the names of the things required and which we give to the works.

"Q. This recommendation for repairs, which is recommended by you is not signed by either yourself or the chief engineer of the ship? A. No.

"Q. On whose billhead or paper is the list made? A. This list is made in the ship by the engineer and I go and sanction it, and afterwards, when the work has been done, I sign the list, and Mr. Maris Embiricos afterwards signs it, and it goes to the cashier and is paid."

Later, when asked as to the condition of the condenser, Kairis answered: "A. The engineer did not report anything to me. He told me everything was in order; * * * as the engineer did not tell me anything, I did not make any" test of the condenser. The steam valve, he said, "was in good order because it was never reported from the chief engineer."

From this and other testimony it is plain that, in the early stages of the examination of Kairis, he had little, if any, independent recollection of the repairs reported as necessary to be done, and this weak recollection was probably due to the procedure. That procedure was for the chief engineer to submit his list of repairs to Embiricos, and then for Kairis to go to the ship and approve or disapprove the items on the list. The next step was to report to the company.

"Q. It was your duty to report to the company, was it not, any condition that you found about the vessel that needed attention? A. Certainly. When I used to inspect, and find anything, I used to tell the company.

"Q. By 'company' you mean the National Steam Navigation Company of Greece, do you? A. Yes; the owners of the steamer which I inspect.

"Q. And anything that came to your attention regarding the condition of the ship, by what you saw, or by what some one may have told you—you always made a report of it to the company, or in some way told them about it? * * * A. When I am sent to inspect a ship and find anything, I tell them of it. When I find it in order, I tell them it is in order.

"Q. But when you found things not in order, whether you saw them yourself or it is called to your attention, you always report to the company? A. I report to the company."

Embiricos was an experienced master of steamers. He testified that he had "not a great experience" as a marine engineer, "but by the many years I was at sea, what any experienced captain may have, I have got it." The company "receives notes of what is required to be done, and we always give instructions that it should be done." "We had Kairis who gives his opinion in the different matters arising and who bears the rank of superintending engineer to a lot of Greek ships."

In regard to inspection, the following is sufficiently important to extract in extenso.

"Q. As I understand it, the only inspection made of the ship—that is, the only inspection made at Piræus—is the one that is made by Mr. Kairis? A. Yes, to the machinery. I and Avgoustis go on board and inspect the ship.

"Q. That is, you inspect the hull generally? A. Yes, generally; and, if I don't go, some one else goes.

"Q. If you don't go, who is the some one who does go? A. Avgoustis gives the captain and the first and second mates a report.

"Q. Are these inspections made at all times with some director of the line present, you or some other director? A. No; it is always I. No other one. I am—never absent from Piræus.

"Q. Did you go on board and inspect the Thessaloniki at Piræus on her arrival from New York and Bermuda, on the voyage previous to the one on which she was lost? A. I don't remember exactly if I went, but generally I go myself on board and inspect them.

"Q. Then you cannot swear positively that you or another director made an inspection at the time I have just referred to? A. Other directors don't go on board. I am the only director who goes on board.

267 F.—6

"Q. If you did not go on board, then Mr. Embiricos, no director of the company made inspection at that time. A. There don't exist any other directors that go on board. I am the only one. The other directors of the company don't examine the ships.

"Q. And if you did not go on board on this occasion, then that inspection by you as a director of the company was not made? A. If I don't go on board the inspection is made by the people we have specially for inspecting. For instance, if I am absent from my house it does not mean that it falls in. * * *

"Q. Mr. Embiricos, I wish you would please tell us completely and fully just what inspection the corporation itself made, if any, at the time that the vessel arrived at Piræus from New York and Bermuda on the previous voyage to the one on which she was lost? A. How should I remember that. Every voyage we make the ships undergo repairs.

"Q. You don't recall, then, whether any inspection was made, whatever, at this time I have just referred to? A. The inspection took place. What repairs were taken in hand I don't remember. The ships are always inspected when they arrive at Piræus.

"Q. Mr. Embiricos, I haven't asked anything about repairs. I have not asked now about what is usually done when ships arrive in Piræus. I have confined my question to the nature of the inspection made, or the inspection made, if any, of the steamship Thessaloniki by the National Steam Navigation Company of Greece, the owners of that ship, at the time the ship arrived at Piræus from New York and Bermuda on or about the 30th day of October, 1915? A. That is exactly what I don't remember. I don't even remember the date, but Kairis, Avgoustis, and the captain are always regular in their inspection.

"Q. Did you see any inspection made, yourself, at this particular time? A. Of course. Meanwhile I have been three or four times into that steamer, but what was done I can't remember.

"Q. Do you of your own personal knowledge know whether or not any inspection was made at Piræus, on or about the 30th day of October, 1915 (Greek calendar), of the boilers, engines, pumps, and hull of the steamship Thessaloniki? A. Of course it is done. Whenever a ship arrives, an inspection is made. I have said this about thirty times already.

"Q. I am asking the question, not about what happened on other times. I am asking your personal knowledge at this particular time I am speaking of? A. Of course I am certain that on this voyage it was made minutely from stem to stern, from the bottom to the top, of the machinery, etc.

"Q. Do you know that personally? A. Of course, as the company, I am sure that the ship left in order.

"Q. I renew my question. A. An inspection was made perfectly on that voyage.

"Q. (to the interpreter). Is he testifying of his own knowledge of that? Did he see it made? A. Of course, I went three and four times on board that steamer, and saw that it was done, and I also follow everything that is done.

"Q. Well, as you follow everything that is done, please just tell us just what was done on that inspection you have just spoke of. Don't you make your inspection by the same general method every time? A. Yes, always; but the ships are a lot, and I don't know exactly what happened on that ship.

"Q. Please tell us the method of making that inspection—the general method that you go about making inspection of all your ships? A. I go on board with Avgoustis and Kairis, accompanied by the captain, and we make a general inspection, from stem to stern, of the hull.

"Q. Is there anything else to that inspection? A. And Kairis generally goes down to inspect the machinery, but I often go with him and inspect the ship.

"Q. Do you go down to the engine room sometimes? A. Always.

"Q. Do you enter the boiler room sometimes? A. Often; but this voyage I did not go down.

"Q. On this voyage you did not personally go into the boiler room? A. I do not remember if on that voyage I had gone down into the boiler room.

"Q. You cannot swear positively whether you did or did not? A. No; I can't remember.

"Q. What is your best recollection about it? A. I don't recollect if I went or not. I don't give great care to such matters, as I am not a specialist, a technical specialist; but there is Kairis.

"Q. You mentioned the name of a man named Avgoustis, who accompanied you on certain of these inspections of the ship, at the time referred to here. What was his official title with the company? A. I have mentioned it. He is caterer, and also chief of the stewards. I mean inspector of the stewards. And he also looks and sees that the third class should be in order, the cabins, etc. He helps me. He has great experience; he is 25 years at sea, and he assists me by letting me know what requires being done.

"Q. In other words, you were thoroughly familiar with the condition of the ship Thessaloniki in every respect at the time she sailed from Piræus for New York on her last voyage, on the voyage at which time she was lost? A. Of course. That which was done to all the other transatlantic liners for the last nine years was also done to that. We gave it our greatest care.

"Q. Mr. Embiricos, is your answer to my last question yes or no? A. Which is the last answer?

"Q. (to the interpreter) : In which I asked him if he was familiar with the condition of the ship when she sailed? A. Yes.

"Q. And you were familiar with her condition before she sailed on that voyage? A. Yes; I have said so. Yes.  *  *  *

"Q. Do you ever take any interest in examining the log books of your vessels from time to time as general manager, to ascertain the speed or condition of the vessels? A. Yes.

"Q. That is, you keep posted as to the general speed and condition of the vessels, from time to time? A. Yes.  *  *  *

"Q. And it is through that channel, is it, that you get any knowledge that you may have of the technical condition of the vessels—through Mr. Kairis? A. Yes; the channel is through Mr. Kairis and the chief engineer of the ship.

"Q. Am I correct in observing the other day that Mr. Kairis has an office in the building, in your suite here in the building? A. He passes from here often.

"Q. Has he got an office here, a room for his work? A. We have an office here, just for the purpose of interviewing the engineers in general here.

"Q. This is the head office of the company, is it? The main office? A. Yes."

It is interesting to note that Embiricos was endeavoring to make plain beyond question that his familiarity with the ship justified him in stating that it was, in all respects, in good order. It is not unfair to conclude, however, that when he realized the effect of his answers that he always went down to the engine room, and often to the boiler room, he thought he would safeguard himself by stating that on this occasion he did not; but, not being quite sure as to whether such an answer would do, he immediately sought refuge in the equivocal "I can't remember"—a striking inconsistency within the space of three succeeding questions.

In addition, the list of repairs to be done was thrown away by the repair man Perrakis. This may have been entirely innocent so far as Perrakis is concerned, but the result is that a contemporaneous record of great importance is not available. The question is not merely what repairs were done, but what repairs were thought necessary to be done, and this list becomes of substantial interest, because Embiricos must have known its contents. Indeed, it is seldom that a serious case is characterized by the disappearance of three records (this list and the two logs) which might throw must light on vital facts.

The inspection of the Greek authorities at Piræus must be dismissed as of no value. The examination of the Classification Society made by Kairis forms no basis for reliance by petitioner, because it cannot be regarded as an

independent examination, in view of the employment of Kairis by petitioner. Indeed, such service to two masters is inconsistent, and such practice is inferentially disapproved by Mr. Barnes, the Lloyd's surveyor at Piræus. The work done at Middlesbrough in 1913 was, no doubt, satisfactory as far as it went, but in no way negatives the conclusion that the boilers needed further careful attention at Piræus.

Without further analysis of many pages of testimony, it must be concluded on the facts, as a fact, that Embiricos knew the condition of the boilers when the ship left Piræus. If such is too strong a statement, it may be said, in any event, that the petitioner has failed to prove want of knowledge or privity. Matter of Reichert Towing Line, 251 Fed. 214, 163 C. C. A. 370; The John H. Starin, 191 Fed. 800, 112 C. C. A. 286; In re P. Sandford Ross, 204 Fed. 249, 122 C. C. A. 516.

Finally, it may be asked what motive could Embiricos have had in letting the ship sail in an unfit condition? He was heavily interested financially; that he supposed for one moment that the ship would get into difficulties is unthinkable. But time was important. The war was making bottoms great earners, and delays were unprofitable. To clean these boilers thoroughly, was a tedious job, which, to one who did not apprehend any real danger, could just as well be done in New York, rather than delay the voyage of a vessel carrying a large and profitable cargo. It was doubtless as much of a shock to Embiricos, as to every one else in interest, when he learned that a ship was lost in a part of the Atlantic in which many other vessels had successfully weathered the storms and had found their way safely to and from ports of destination.

The petition must be denied, with costs.

I have not deemed it necessary to discuss the contention as to the racing of the propeller.

Settle decree on five days' notice.