## THE TURRET CROWN.

(District Court, S. D. New York. May 12, 1922.)

1. **Shipping ☞141(4)—Ship exempted by bill of lading from liability for damage from unseaworthiness, where owners exercised due diligence.**

Under a clause in the bill of lading exempting the carrier from liability for loss or damage to cargo occasioned by unseaworthiness, "even existing at time of shipment or sailing on the voyage, provided the owners have exercised due diligence to make the vessel seaworthy," the ship *held* not liable for damage caused by leakage, though unseaworthy in respect to her bottom riveting, where she had been dry-docked within a few months and pronounced in good order and the owners had conformed with every suggestion as to repairs.

2. **Shipping ☞141(3)—Exception of perils of the sea not effective as to damage to which carrier's negligence contributed.**

An exception in bills of lading of perils of the sea does not relieve the carrier from liability for loss or damage caused by sea perils, if its own fault or negligence was a contributing cause.

3. **Shipping ☞120—Ship held not liable for damage caused to cargo on pier by extraordinary flood tide.**

Damage to cargo, after its discharge on a pier at a port of refuge, caused by an extraordinary flood tide, *held* due to act of God, for which the ship was not liable.

4. **Shipping ☞121(1)—Unseaworthiness does not abrogate contract of carriage.**

Unseaworthiness of the vessel, while it deprives the carrier of the benefit of all exceptions as to liability, leaves the other conditions of the bill of lading in force.

5. **Shipping ☞125—Deviation, when necessary for safety, does not displace contract.**

Where on a voyage it becomes necessary for safety of the ship, crew, and cargo to seek a port for repairs, such deviation does not displace the contract of carriage, though made necessary by unseaworthiness.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Shipping ⬦131—Loss of cargo; right of carrier to insurance; "payment."**

 Conditional advances made by insurers to cargo owners, pending suits by the latter against the carrier for damages, are not "payments" which inure to the carrier under a clause of the bills of lading giving it the benefit of any payments made by insurers, "whether under the guise of advances, loans, or otherwise," where they were not intended by the parties as payments.

 [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Payment.]

In Admiralty. Suits by the Patent Vulcanite Roofing Company, Inc., by Carlo Repetto, by Sacco & Palmieri, and by J. Aron & Co. Inc., against the Steamship Turret Crown; claimed by the Commonwealth Steamship Company, Limited. Libels dismissed.

See, also, 275 Fed. 961.

Bigham, Englar & Jones, of New York City (D. Roger Englar, Harold V. Amberg, and Forrest E. Single, all of New York City, of counsel), for libelants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey and Theodore M. Hequembourg, both of New York City, of counsel), for claimant.

WARD, Circuit Judge. Four libels were filed against the steamer Turret Crown to recover for damage to cargo shipped in good and delivered in bad order, and in one of the cases also for short delivery. The cases were tried together. The answer of the claimant set up the following clauses in the bill of lading, relying especially upon the provisions in italics:

"It is mutually agreed * * * that the carrier shall not be liable for loss or damage occasioned by * * * any latent defects in hull, machinery or appurtenances, misfeasance, error in judgment, any act, neglect or default whatsoever of pilots, masters or crew in the management or navigation of the ship, collisions and *all and every other dangers and accidents of the seas, rivers and canal, and of navigation of whatever nature or kind excepted or unseaworthiness of the ship, even existing at time of shipment or sailing on the voyage, provided the owners have exercised due diligence to make the vessel seaworthy;* * * * *nor for land damage or damage* * * * *by contact with other cargo or sea water;* * * * nor for risk of craft, hulk or transshipment; *nor for any loss or damage caused by the prolongation of her voyage and/or delay occasioned by any reason whatsoever.* * * *"

If I were to set forth the evidence and the contentions of the parties in detail, this opinion would run to a cruel length. It will be sufficient for the parties, who are familiar with the case, and for the court, if an appeal is taken, for me to indicate briefly what leads me to my conclusions.

February 25, 1918, at 9:30 a. m., the Turret Crown sailed from New York for Genoa with a general cargo. We learn from the deck and engine room logs as follows:

February 26, at 3:45 a. m., she hove to because of trouble with the steam steering gear as the result of the engine having become loose on its foundations. Down to this time there had been nothing more than a fresh gale, which continued to 3 a. m. of the 27th.

February 27, at 11 a. m., stopped because unable to keep steam on account of water in fuel oil. Throughout the 26th and 27th the vessel is described, not as pitching, but as "rolling heavily."

February 28, at 5 a. m., the steering gear jammed as the result of an old patch, mentioned in a survey at Salina Cruz on the preceding voyage from Seattle to New York, getting displaced and bearing down on the collar of the control valve bevel wheel. The steamer stopped and some repairs were made. At 11:20 a. m., she proceeded again at full speed, but, the steering gear still jamming and making it impossible to steer the ship, she stopped again. Pumping water out of the fuel tanks continuously. Vessel rolling heavily. 0.25 stopped and altered control valve on steering engine. At 1:35 p. m., she proceeded again, but at 3:15 stopped, because the old patch had dropped down again, making steering impossible because of constant jamming. The old patch was tightened up, and the steamer proceeded again at 4 p. m. full speed according to the deck log, and slow according to the engine room log. 6 p. m. stopped again and altered control valve of steering engine. 7:20 p. m., proceeded. Steering engine as bad as ever. 8 p. m., stopped and altered control valve back to original. Rolling heavily. 9 p. m., decided to return to port on account of steering engine, water in fuel oil, and inability to keep up steam. Midnight. Vessel pitching and rolling heavily.

March 1, 9 p. m., steering wheel jammed on starboard helm and steamer swung around from W. N. W. to south and east, causing seas to break on board with tremendous force. Vessel pitching and rolling.

March 2, 1 p. m., the steam gear was disconnected and the hand gear substituted.

The chief engineer testified that, when the steering engine began to give trouble, which must have been February 27th at about 10:55 a. m.:

"Q. What happened? Tell me in your own words. A. The day after we left we got into very bad weather, and I believe somewhere about half past 10 or 11 o'clock the fourth engineer reported to me that he was getting water in the fuel. I went down and tried to pump out, tried the transfer pump on the tank, tried the settling tanks, tried No. 2 tank; just the same thing, we were getting water there. No 3 tank was all right, and I went back to No. 1 tank; got water in No. 1 tank. No. 2 tank was the same. At that time the steering engine began to give us trouble; went to start the steering engine and found foundation bolts was all slack. They went through the deck, and they went through into No. 3 hold, and to get into there we had to move a lot of cargo, and the weather was that bad it wasn't safe to take the hatches out; we had two off and had them standing by to put them on again if she shipped any heavy water. I went down myself with a Stillson wrench to get to two of them; couldn't get to the others. I think there was 12 bolts in there. I tightened up the two and had to go ahead again. * * *

"Q. Where was this patch on the steering engine? A. Underneath the control valve, there was something or other broken out, and they put a wrought iron patch on there, with 4 or 6 bolts, ⅜ths I think it was. That came to within about a quarter of the top of the bevel wheel collar. The collar on the top revolved around with the bevel wheel. When she started to work on the foundation, she worked this patch along and jammed the collar, so that when they got her hard over she stuck and they couldn't move it from the bridge. When I found that out the first time, I raised the collar and jammed this patch up, and it still kept coming down, and I cut out about three-quarters of an inch of the patch. I didn't take anything off the col-

lar; I took it off the patch. We finally came to the conclusion we would turn back; we couldn't get no oil to turn back, and we put her under hand gear."

March 5, the fuel oil having given out, a wireless was sent for help, and the steamer lay at the mercy of the wind and waves.

March 6, burning chairs, tubs, spare oars, ladders, etc., to keep up steam for the pumps and dynamos.

March 7, at 5:20 a. m., the revenue cutter Androscoggin picked the steamer up and began towing her.

March 8, began to burn roofing paper to raise steam for steam gear and pumps, and continued to do so until arrival at Boston on March 20th, at 9 p. m.

At Boston the steamer took on a supply of fuel oil, made temporary repairs, and came to Pier B, Jersey City, under her own steam and hand steering gear. There she discharged her cargo, and shipments of codfish and salmon were injured by an extraordinarily high tide which overflowed the pier.

I am satisfied that the weather was not exceptional, but was such as was to be expected in the north Atlantic in the month of February, and such as a seaworthy vessel should have withstood without underdeck injury. The winds never rose above a fresh gale. The log and the protest prove this, as do the weather reports from shore and on sea, and as does the testimony of Mr. Kimball, of the United States Weather Bureau at New York.

The libelants very rightly point out that, though the observer on the top of the Whitehall Building recorded the wind velocity of 81 miles for a five-minute period February 26th, at 8 a. m., the records at other stations were as follows:

S. S. Turret Crown—"Fresh gale," or force 8, between 40 and 48 miles an hour.

U. S. Army Transport Buford—"Between 8 and 9," or about 48 miles an hour; between a fresh and strong gale. The Buford was approximately 84 miles S. E. of the Turret Crown, and approximately 200 miles E. S. E. of New York.

Block Island—40 miles, or between a moderate and a fresh gale, force 7 to 8.

Philadelphia—Under 29 miles per hour, or not in excess of a fresh breeze, force 5.

New Haven—32 miles, or strong breeze, force 6.

Providence, R. I.—Under 29 miles, or not in excess of a fresh breeze, force 5.

Boston, Mass.—Under 29 miles, or not in excess of a fresh breeze, force 5

Scranton, Pa.—44 miles, or a fresh gale, force 8.

Albany, N. Y.—Under 29 miles, or not in excess of a fresh breeze, force 5.

New York (on top of Whitehall Building)—81 miles, or a hurricane, force 12.

It is also significant that the master did not use the oil bags to relieve the steamer.

The Turret Crown was built in 1895, and converted from a coal burner to an oil burner in January, 1916, when she was over 20 years old. She sailed from Seattle, September 29, 1917, and arrived at her berth in New York, December 27, 1917. October 12, between 8 a. m. and 3 p. m., she encountered a terrific hurricane, which swept the tarpaulins and hatch covers off hatch No. 2 and damaged the sacks of rice

at that point. She went in to San Pedro to discharge and recondition, as far as possible, the wet sacks, and at Salina Cruz she was surveyed; from there by the Panama Canal to Havana, where she discharged her cargo in good condition; thence to Jacksonville for fuel oil and temporary repairs. There is no entry in the log of any water having entered the fuel tanks through the bottom on this voyage of three months. The damage was all deck damage. It is true that at Jacksonville there was found oil leaking through the top of tank No. 2, and on several days of the voyage from there to New York, light, viz. December 2, 3, and 4, water appeared above the tank tops in holds No. 1 and No. 2. What caused this does not appear; the leak, wherever it was, stopped and the cause of it is not explained. It apparently did not come through the bottom, because, after repairs were made at New York, tank No. 2 was found to be tight when subjected to the usual water pressure test.

[1] Bottom damage is said to be caused by pounding, and is most unusual in the case of loaded vessels, though frequent in the case of light or partly loaded vessels. No apprehension of such damage was indicated in the survey at Salina Cruz, and the steamer discharged her very perishable cargo of rice in good condition at Havana. She had the highest classification in the Bureau Veritas; had been dry-docked in August, 1916, and in August and also in September, 1917, and pronounced to be in good order. No one of the surveyors at New York, before her departure on the voyage in question, intimated that she should be dry-docked again. The owners conformed with every suggestion that was made as to repairs. Under these circumstances, I think that they exercised due diligence within the meaning of the clause in the bill of lading, and though I find that the vessel was unseaworthy in respect of her bottom riveting, they are relieved for this particular unseaworthiness by the clause in the bill of lading. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Laertes, 12 Prob. Div. 187.

[2] The claimant very properly contends that the primary cause of the cargo damage was the water taken into the fuel tanks through the bottom. But the libelants say that the loss of power to steer the vessel in heavy weather increased the strain to which she was subjected and contributed to the bottom damage. If so, the ship would be responsible. The Jeanie, 236 Fed. 472, 149 C. C. A. 515 (C. C. A. 9):

"This brings us to the question whether, conceding all that the appellant claims for perils of the sea, the carrier is relieved from liability for loss or damage from such perils, where the carrier has by his fault or negligence contributed to such loss or damage. In Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438, 9 Sup. Ct. 469, 470 (32 L. Ed. 788), the Supreme Court, commenting on the difference in liability on the part of the insurance company and the carrier with respect to loss and damage caused by perils of the sea, said: 'Collision or stranding is doubtless a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them. * * * But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held,

an exception in the bill of lading of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed.'

"This decision was rendered in 1888, and prior to the Harter Act; but this act does not touch the law here declared, except in the navigation and management of the vessel. The obligation of the carrier with respect to the cargo remains the same. The Supreme Court cites the case of The Xantho, in the House of Lords, 12 App. Cas. 503, 510, 515. Lord Herschell, in that case, states that the true view with respect to the carrier's liability had been stated by Willes, J., in Grill v. General Iron Screw Collier Company, L. R. 1 C. P. 600, 611, as follows: 'I may say that a policy of insurance is an absolute contract to indemnify for loss by perils of the sea, and it is only necessary to see whether the loss comes within the terms of the contract, and is caused by perils of the sea; the fact that the loss is partly caused by things not distinctly perils of the sea does not prevent its coming within the contract. In the case of a bill of lading it is different, because there the contract is to carry with reasonable care, unless prevented by the excepted perils. If the goods are not carried with reasonable care, and are consequently lost by perils of the sea, it becomes necessary to reconcile the two parts of the instrument, and this is done by holding that if the loss through perils of the sea is caused by the previous default of the shipowner, he is liable for this breach of his covenant.' "

The bolting of the steam steering engine was so insufficient that it worked loose on its foundation in weather fairly to be expected. The nuts on the holding-down bolts could not be tightened from above deck, and when the chief engineer tried to get at them under deck the cargo prevented him from doing so, and he was only able to tighten two of them. Moreover, the old sore pointed out in the survey at Salina Cruz became displaced and caused the steering gear to jam. No attention whatever seems to have been paid at the survey at New York to the steering engine, nor any notice whatever taken of the warning in the Salina Cruz survey about the old sore. Likewise in the case of the hand steering gear, which also broke down as the result of one of the two large nuts connected with the cross-head of the rudder cracking, which the Salina Cruz survey recommended to be replaced, nothing was done in New York. Therefore I think that both in respect to the steam and the hand steering gear the steamer was unseaworthy.

But the question is whether this unseaworthiness, whose defects were fully developed before water got into the fuel tanks, contributed to the bottom damage which injured the cargo. Of course, after the fuel oil gave out, the steering gear, even if perfect, would have been of no possible consequence. The deck log continuously describes the behavior of the steamer in the sea down to the time when she turned back as "rolling heavily." Rolling does not imply the pitching, which causes bottom damage. Even if the vessel fell off so far as to be in the trough of the sea, there would be no pounding. It seems to me that the breaking down of the steering gear, instead of increasing, decreased the strain upon the vessel. There is testimony that proper seamanship requires a steamer in heavy weather to head to sea with her engines going. But this is not the view of Admiral Knight in his work entitled "Modern Seamanship," 7th edition. He says at page 509:

"The conventional way of handling a steamer when the weather is too heavy for her to proceed on her course is to bring her up until she has the

sea on the bow and to hold her there by the engines, and the helm, assisted by such after sail as may be available. In this position, most steamers have a constant tendency to fall off, and can only be held up by giving them way enough for the rudder to exercise considerable steering power. They are thus, to some extent, forced into the sea, and the more it is necessary to force them, the greater the strain to which they are subjected, and the greater the probability of their taking water on board in dangerous quantities. This method of riding out a gale has been handed down from the days of bluff-bowed sailing ships and of steamers with more or less complete sail power. Such ships were held up to wind and sea by their ample after sail, with little or no headway. If they fell off—as from time to time they did—and started to gather way, the hard down helm and after sail would bring them promptly back to meet the sea. Thus they came up and fell off, making some little way through the water, but none of it against the sea, and, in the main, drifting steadily to leeward. For such ships, this was and is the ideal way of riding out a gale. But a modern steamer, whether man-of-war, liner, or tramp, carries very little after sail and is commonly long and sharp. The propeller acts as a drag, tending to hold her stern up to the sea, and this tendency is assisted by the excess of draft which such steamers usually have aft. To hold such a steamer bows on to the sea, she must be forced into it—not at great speed, perhaps, but sufficiently to strain the ship severely and to suggest grave doubt as to the wisdom of this method of lying to. The opinion is gaining ground of late years that a steamer of this type shuld run slowly before a sea, or lie to with the sea astern or on the quarter; and this view is supported both by theoretical considerations and by a convincing amount of practical experience.

"Another point which enters into the behavior of a vessel going before the sea is that as she rolls and pitches she buries first one bow and then the other, increasing the pressure on the bow so buried. If, now, she is being driven through the water, her head will be forced off, first to one side and then to the other, causing her to yaw badly with a continual tendency to broach to; and this cannot be met by the rudder, because, at the very time the bow is buried, the stern is lifted more or less out of the water, and the rudder loses, for the moment, its steering power. As the stern is lifted, there also comes a racing of the propeller, which is in itself a serious danger at high speed. Whether these points be sufficient to entirely explain the fact or not, there seems no question that the dangers connected with running, so far from being increased, are greatly reduced, if not altogether removed, by slowing or stopping."

The whole chapter on "Handling Steamers in Heavy Weather" is most illuminating, especially the written opinions of shipmasters, of which the author says:

"The author of the present work has collected the views of forty prominent shipmasters upon the subjects of the preceding pages. Of these, thirty-two strongly advocate either stopping the engines entirely, or turning over dead slow and bringing the sea aft or nearly so. Seven prefer to lie to bows on, but think the other method perfectly safe for most steamers. Three have tried the experiment of stopping the engines, but found the rolling so alarming that they were obliged to bring the sea on the bow. It is an interesting fact that these three were captains of large Atlantic liners."

If forcing the steamer into the sea, whether a head sea or a following sea, at a speed sufficient to give steerageway did contribute to the bottom damage, it was an error in navigation and management of the vessel, for which the claimant is excused by the Harter Act (Comp. St. §§ 8029–8035).

[3] For the damage to cargo when discharged on Pier B, Jersey City, after the return, which was caused by an extraordinary flood tide, I think the ship is not liable. The proximate cause and the causa causans was an act of God—the extraordinary high tide.

[4, 5] The libelants contend that the putting back to New York was a deviation, and that the claimant thereby became an insurer. Unseaworthiness has not the same effect upon the contract of carriage as a voluntary deviation has. The latter displaces the whole contract and leaves the carrier liable as at common law. Unseaworthiness, on the other hand, while it deprives the carrier of the benefit of all exceptions as to liability, leaves the other conditions of the bill of lading in force. The Europa [1908] Prob. 85; Joseph Thorley & Co., Ltd., v. Orchis Steamship Co., Ltd., [1907] 1 K. B. 660; Kish v. Taylor, [1912] App. Cas. 604, 618. Lord Atkinson said:

"On the second point it is not disputed that it is prima facie not only the right, but the duty, of the master of a ship to deviate from the course of his voyage and seek a harbor or place of safety, if that be reasonably necessary in order to save his ship and the lives of his crew from the perils which beset them. Neither is it disputed by the appellants that they are answerable in damages to every person who sustains loss or injury by reason of the breach of their warranty of the seaworthiness of their ship, and they further admit that they cannot require the owners of the cargo or any portion of it to recoup them to any extent for any loss they may have sustained or expense to which they may have been put as a result of this breach of warranty, or of any course they may have had to take in consequence of it. That voluntary or unwarranted deviation may render the contract of affreightment void ab initio was decided by the Court of Appeals in Joseph Thorley, Ltd., v. Orchis Steamship Co. What the appellants contend is, in effect, this: That justifiable deviation does not avoid the contract; that, to use the language of Lord Watson in a case to be presently referred to, 'it is, the presence of the peril and not its causes' which justify it; and that it is, therefore, immaterial whether the unseaworthiness of the ship or her negligent navigation contributed directly to the peril or not. Judged by that test, it is not disputed that the deviation in the present case was justifiable, and, if so, that the contract of affreightment was not void ab initio. So that the question for decision resolves itself into this: Is it the presence of the peril and not its cause which determines the character of the deviation, or must the master of every ship be left in this dilemma: That whenever, by his own culpable act, or a breach of contract by his owner, he finds his ship in a perilous position, he must continue on his voyage at all hazards, or only seek safety under the penalty of forfeiting the contract of affreightment? Nothing could, it would appear to me, tend more to increase the dangers to which life and property are exposed at sea than to hold that the law of England obliged the master of a merchant ship to choose between such alternatives."

[6] As in case of an appeal, the higher court may not agree with me as to the claimant's liability, I will discuss the question of insurance. The American policies contain one or the other of the following clauses:

"Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto, and for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon."

"This insurance is warranted to be in all cases null and void to the extent of any insurance by any carrier or bailee which would attach and cover said property if this certificate had not been issued, and to be null and void, as concerns loss or damage by fire on land, to the extent of any insurance against loss or damage by fire directly or indirectly covering upon the same property whether prior or subsequent hereto in date or of the same date herewith, anything hereinbefore contained to the contrary notwithstanding; and it is also understood and agreed that in case any agreement shall have

been or shall be made or accepted by the assured with any carrier or bailee by which it is stipulated or agreed that such or any carrier or bailee shall have, in case of any loss for which he may be liable, the benefit of this insurance, or exemption in any manner from responsibility grounded on the fact of this insurance, then and in that event the assurers shall be discharged of any liability for such loss hereunder, but these assurers, in those and all cases of loss or damage by perils insured against, shall be liable and owe actual payment for only what cannot be collected from the carrier, bailee, and/or other insurers of property lost or damaged, but also shall be chargeable with the direct pecuniary consequence to the assured temporarily arising from delay in collection from said carrier and/or bailee and/or insurers, and the advancing for this purpose only, of funds to the assured for his protection pending such delay, shall in no case be considered as affecting the question of the final liability of these assurers, and as soon as collection is made from the carrier, bailee and/or insurers, the right of the assured to hold the sums so advanced by these assurers shall discontinue and a portion thereof equal to the sum collected from such carrier, bailee and/or insurers, shall be repaid to these assurers, but in case of final failure to collect from such carrier, bailee and/or other insurers a portion of the sums advanced by these assurers, equal to the sum short collected from such carrier, bailee and/or other insurers, may be retained and applied in settlement of the actual liability of these assurers thereby established (provided always the loss shall constitute in other respects a claim under this insurance). In the event of loss or damage, this insurance shall be null and void in the extent of any payment made by any carrier, bailee, or other insurers, whether liable or not."

The bill of lading contains a clause reading:

"* * * The carrier shall be entitled to the benefit of any insurance on the goods and to any payments made by or on behalf of the insurers thereof whether under the guise of advances, loans, or otherwise. * * *"

Under this clause the carrier is entitled, first to any insurance which the shipper has; second, to any payments of insurance made by the insurer, whether under the "guise of advances, loans, or otherwise." The net result is that the carrier is to have the benefit of any insurance the shipper is entitled to or which the insurer pays.

In the Phœnix Insurance Case, 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873, it was held that the insurer is subrogated to the rights of the shipper against the carrier, in the absence of anything to the contrary contained in the bill of lading, but that, if the bill of lading gives the carrier the benefit of the shipper's insurance, there is nothing to which the insurer can be subrogated.

In the Inman Case, 129 U. S. 128, 9 Sup. Ct. 249, 32 L. Ed. 612, it was held that, under a policy which was to be void if the insured made any agreement to give the benefit of his insurance to the carrier, the insurers could require the insured to sue the carrier first, and could decline to indemnify him until the carrier's liability was determined. If the carrier were held not liable, the insurer would have to pay; but, if it were held liable, the insurance was void.

These cases were followed by the decisions of the Circuit Court of Appeals of this circuit in Pennsylvania R. R. Co. v. Burr, 130 Fed. 847, 65 C. C. A. 331, Bradley v. Lehigh Valley Railroad Co., 153 Fed. 350, 82 C. C. A. 426 and finally by Luckenbach v. McCahan Sugar Refining Co., 248 U. S. 139, 39 Sup. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522, which approved and gave the largest possible latitude to the practice of insurers to loan money to the insured pending litigation against

the carrier. Mr. Justice Brandeis said (248 U. S. at page 149, 39 Sup. Ct. at page 55 (63 L. Ed. 170, 1 A. L. R. 1522):

"It is essential to the performance of the insurer's service that the insured be promptly put in funds, so that his business may be continued without embarrassment. Unless this is provided for, credits which are commonly issued against drafts or notes with bills of lading attached would not be granted. Whether the transfer of money or other thing shall operate as a payment is ordinarily a matter which is determined by the intention of the parties to the transaction. Compare The Kimball, 3 Wall. 37, 44. The insurer could not have been obliged to pay until the condition of their liability (i. e., nonliability of the carrier) had been established. The shipper could not have been obliged to surrender to the insurers the conduct of the litigation against the carrier, until the insurers had paid. In consideration of securing them the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice."

I do not see that the words in this bill of lading added to the usual clause make any change whatever in the relations of the parties. Where the policy provided that there should be no liability in case the shipper had agreed to give the benefit of it to the carrier there was no insurance at all, and there was no payment of any insurance when the insurer advanced moneys to the insured pending litigation against the carrier, unless it is clear he intended to do so. Therefore the claimant could get no benefit from these policies, which were not free of particular average; the loss being over 3 per cent.

Under the policies, which were free of particular average, the insurers must be understood to have made a loan, and not a payment. The dispute between them and the insured was whether the free of particular average clause was nullified because the steamer was aground at Boston, and this resulted in an agreement that the insurers would pay 50 per cent. of the loss. The settlement evidently applies in event of the insurers failing to recover against the claimant. The insurers insisted that suit should be brought against the claimant on their behalf, as well as on behalf of the libelants. The American Merchant Marine Insurance Company was the leader of the underwriters in this settlement. It paid in a check described as a loan. The other underwriters followed suit. It would be, as Judge Wallace said in the Bradley Case, supra, "to indulge in a violent and preposterous presumption" to assume that the underwriters intended by these transactions to waive their rights.

The English insurers, which admitted the seaworthiness of the vessel, were bound to pay under their policies. They could not compel the insured to sue the claimant first. Therefore to accept a loan would be really to receive payment of a loss "under the guise of a loan," and the claimant would be entitled to the benefit of this insurance.

It having been proved that the libelants have secured certain French and Italian insurance, I think they are bound to show its terms, so that it may be determined whether the carrier gets the benefit of it or not. As the facts are peculiarly within their knowledge, and not within the knowledge of the carrier, the burden lies upon them to show the terms of this insurance.

The answer in the case of the Vulcanite Roofing Company alleges that part of its shipment was burned for the safety of the common adventure, constituting a general average loss, but as counsel have not discussed the question I will not do so.

The libels are dismissed, with costs.