## THE TURRET CROWN.

**VULCANITE ROOFING CO., Inc., v. COMMONWEALTH S. S. CO., Limited.**

(Circuit Court of Appeals, Fourth Circuit. October 21, 1922.)

No. 1958.

1. Shipping ⬅️142—Notice prior to shipper's suit during voyage held not to support suit after completion of voyage.

Where vessel returned to port because of storm damage, and part of cargo was unloaded and ship repaired before completion of voyage, and, while ship was at port with part of cargo unloaded, the shipper sued to recover damages estimated at $125,000, notice given prior to such suit in

accordance with the terms of the bill of lading was not sufficient to support suit for damages for $275,000, filed over two years thereafter, not covering damages occurring after repairs were completed and the voyage begun the second time, but based upon the claim that the full extent of damages was not discoverable at the time of the first suit; for the carrier had the right to rely upon the terms of the notice given as embracing the entire extent of the claim.

2. Shipping ⟨⟩140—Putting back to port because of storm, even if necessitated by unseaworthiness, not an "unjustifiable deviation" depriving carrier of benefit of bill of lading contract.

Return of vessel to port on account of storm, although necessitated by unseaworthiness of the vessel, *held* not an "unjustifiable deviation" depriving the carrier of the benefit of bill of lading contract limiting liability.

Libel in personam in admiralty by the Vulcanite Roofing Company, Incorporated, against the Commonwealth Steamship Company, Limited, owner of the steamship Turret Crown. Decree of dismissal (275 Fed. 961), and libelant appeals. Affirmed.

See, also, 282 Fed. 354.

Harold V. Amberg, of New York City (D. Roger Englar, of New York City, and Henry H. Little, of Norfolk, Va., on the brief), for appellant.

John M. Woolsey, of New York City (Edward R. Baird, Jr., of Norfolk, Va., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and GRONER, District Judge.

GRONER, District Judge. This case is here on appeal from a decree of the United States District Court for the Eastern District of Virginia. The action was commenced by a libel in personam filed May 20, 1920, to recover damages in the sum of $275,000 sustained by a cargo of roofing material shipped on the steamship Turret Crown, for carriage to Genoa, under bills of lading issued on the 15th day of February, 1918. The Turret Crown sailed from New York for Genoa on February 25, 1918, and, encountering heavy weather, sustained serious damage, necessitating her return to New York, where she arrived and discharged a part of her cargo the latter part of the following March, having previously put into Boston for temporary repairs. Upon completion of repairs, and about July, she resumed her voyage and delivered the cargo, with the exception of certain portions which had been consumed in her efforts to regain port or were too badly damaged for reloading.

On May 3d, while the vessel was still at New York, appellant filed a libel in rem to recover $125,000 as damages alleged to have been sustained by the cargo. The owner of the vessel (appellee) appeared in that proceeding as claimant, filed a stipulation in the sum of $100,000, and the vessel was released from arrest. An opinion dismissing the libel has recently been handed down by Judge Ward. 282 Fed. 354.

In May, 1920, two years after the original proceedings were begun,

this libel was filed. The respondent answered, certain interrogatories were propounded and answered, a replication was filed, and the case was heard in the lower court on a motion to dismiss on the pleadings. The learned judge of the lower court was of opinion that by paragraph 1 of the bill of lading under which the cargo was shipped, exempting the carrier from liability "for any claim whatsoever unless written notice thereof shall be given to the carrier before removal of the goods from the wharf," and further providing that "no suit to recover for loss or damage shall in any event be maintainable against the carrier unless instituted within three months after giving of written notice as above provided," the suit could not be maintained, and entered a final decree in November, 1921, dismissing the libel with costs. 275 Fed. 961.

The argument before us for a reversal of the decree of the lower court is based upon the claim that the "written notice" required by the terms of the bill of lading was in fact given in apt time before the suit hereinbefore referred to was instituted in the New York district, and that the notice thus given was sufficient for all time and for all damage to, or loss of, the merchandise; also, that the restrictive clause upheld by the decision of the lower court, requiring notice and suit within the respective periods mentioned, is invalid because it is neither just nor reasonable, and should not be construed to exempt the carrier from loss arising from its own negligence. A third point, apparently not discussed in the lower court, but seriously urged before us, is that the "deviation" in the voyage of the vessel, namely, her putting back for repairs and her detention in port until the following July, lost her owners the benefit of the terms of the bill of lading, and that the same no longer apply.

[1] Enough has been already said, perhaps, to show that the libel as filed in the lower court is drawn to cover damage by water and oil occurring on the original voyage. Nothing is alleged tending to show that there is any claim of damage occurring after the repairs were completed and the voyage begun the second time. It will therefore be seen that such damage as a recovery in this action is asked for existed at the time the original libel was filed, but in justification of its failure to include such claim for damages in the then pending action, it is claimed by libelant that the *extent* of the damage was then unknown and continued so unknown, in the exercise of reasonable diligence, for a further period of more than two years; and it therefore insists that this proceeding is properly supplemental to that begun in the New York district, and that therefore no further or other notice than that originally given is necessary, and equally of course no point can be made as to the delay in beginning the action.

And this brings us to a consideration of the case as made. Admittedly, notice of a claim was given within the requisite time before the suit was instituted in the New York district, and it is also admitted that in the notice so given the damages were estimated at $125,000. The action which was thereafter begun in that district, predicated upon the claim thus made, was undetermined for at least three years, and when finally heard and decided was upon the record as originally made.

No attempt was there made to amend the pleadings or to enlarge the claim of damages up to the time this action was begun. The proceeding in the New York District was neither abated, nor was a nonsuit suffered. It is difficult, therefore, to understand upon what theory the action begun in Virginia can be said to be properly supplemental to and affected by the equities obtaining as to the one in New York. Judge Waddill, who heard this case and decided it in the lower court, gave careful consideration to this aspect of appellant's claim, and rejected it, holding that, so far from the notice in the New York suit being notice in this, the contrary was true, "as the respondent had the right to suppose that the suit (there) was brought to cover the libelant's damage." We think no other conclusion than this possible, and our decision must therefore turn upon the validity and reasonableness of the terms of the bill of lading, and, if valid and reasonable, whether effective or lost as we shall determine the question of deviation.

The restrictive clause in the bill of lading, now invoked by appellee, provided, as we have shown, that the carrier should not be liable for any claim for damage to or loss of cargo unless written notice of the same should be given the carrier before removal of the goods from the wharf, and that no suit should be maintainable unless instituted within three months after the receipt of the written notice. If the question in this case depended upon the reasonableness of the provision requiring notice before removal of the goods from the wharf, the position of appellant would be stronger, for we can easily conceive of circumstances in which such a provision would be entirely reasonable, and of others in which it would be equally unreasonable, and it would seem to us that its reasonableness or unreasonableness should be made to depend upon the facts in each particular case. If the damage was open and obvious, or such as in the exercise of ordinary care could be discovered before the removal of the goods from the wharf, undoubtedly it would be the duty of the owner to give immediate notice, where provision for the same had been exacted, and the insistence upon such a provision under such circumstances would not be a hardship of which he could complain. On the other hand, where the character of the damage was such as not to be easily discernible, or where unpacking or inspection was necessary, and this could not be had on the delivery platform of the carrier, such a provision, undoubtedly, would be burdensome, and ought not to be enforced. But, admittedly, no question of this kind can be said to obtain in this case. Here, no notice—if our view that this is an independent action dependent upon its own facts be correct—was ever given; and, on the other hand, even if we accept appellant's view that the notice given before the commencement of the New York proceedings applied here, we should be forced to hold that under the circumstances, and in view of the long and unjustifiable lapse of time between that notice and this suit, appellee had an absolute right to rely upon the terms of that notice as embracing the entire extent of appellant's claim. To say that the provision requiring notice before removal from the wharf is unreasonable because of the difficulty of inspection there, and at the same time to say that, because of this unreasonableness, no obligation at all existed on the part of

the owner of the freight to give notice within a reasonable time after removal, would be to establish a principle of law which would have, we think, no foundation in right or justice. What has been said of the reasonableness of the notice may be said, with even more emphasis, as to the reasonableness of the provision for the institution of the suit. Such provisions are common in the commercial life of the nation, and are found almost without exception in the contracts of carriage by both rail and water, and in cases no more drastic than that now under consideration have invariably been upheld by the courts to encourage promptness, and that "the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents or failure of memory" (Railroad Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690); and, we may add, to enable the party claimed against to verify the justice and reasonableness of the claim by an opportunity, himself, of inspecting the damage or checking against the loss claimed before the subject-matter itself is so lost or mingled as to make investigation impossible. Express Co. v. Caldwell, 21 Wall. 264, 22 L. Ed. 556; The Persiana, 185 Fed. 396, 107 C. C. A. 416; The San Guglielmo, 249 Fed. 588, 161 C. C. A. 514; Ginn v. Ogdensburg Co., 85 Fed. 985, 29 C. C. A. 521; St. Louis R. R. v. Mounts, 241 U. S. 654, 36 Sup. Ct. 725, 60 L. Ed. 1223; Seaboard A. L. Ry. Co. v. Pace, 234 U. S. 751, 34 Sup. Ct. 775, 58 L. Ed. 1576; St. Louis Southwestern Ry. Co. v. Haynie & Co., 120 Ark. 28, 179 S. W. 170; Giles v. Atchison Ry., 92 Kan. 324, 140 Pac. 875; Dunlap v. Chicago, etc., Co., 187 Mo. App. 205, 172 S. W. 1178, etc.

[2] The silence of appellant for two years is neither justified nor excused by anything that appears in the record before us. As already stated, the merchandise which it claimed was damaged was unloaded on the carrier's wharf, and was subject to appellant's inspection and examination for a period of more than three months. This opportunity, apparently, it availed itself of so indifferently as to mislead it to claim less than one-third of its loss. It was reloaded and carried to destination and there delivered to appellant's agent. Opportunity was then again afforded it to check and positively determine the extent of the damage, and, if reasonable diligence had been exercised, and a loss greater than that first ascertained found to exist, we doubt not that some method would have been found, either by amendment to the proceedings begun in New York by timely motion there, or by independent action wherever the vessel or owner might be found, to have fastened liability where it belonged. But to say that a shipper may under such conditions remain silent for a period of two years and preserve unimpaired all his rights, would be, it seems to us, to put a premium upon carelessness, and unreasonably deprive the carrier of the opportunity which it was the purpose of the notice to afford it. To so hold, contravenes no public policy, "excuses no negligence," and "is consistent with holding the carrier to the fullest measure of good faith, of diligence, and of capacity, which the strictest rules of the common law ever required." Caldwell Case, 21 Wall. 264, 268 (22 L. Ed. 556). This being so, there remains only to consider the question of whether,

owing to the first delay of the "Turret Crown" at New York, her deviation to Boston, her return to New York, and her delay until July in going forward, appellee has lost the benefit of the restrictive clauses of the bill of lading. Appellant presents this proposition under two separate headings: First, does an unjustifiable deviation deprive the carrier of the benefit of the bill of lading contract; and second, was there an unjustifiable deviation in the instant case?

We cannot look beyond the record for the facts upon which to reach an answer to these two queries. The libel alleges no more than the failure of the vessel to deliver the goods in the condition in which they were shipped, except the bare statement that the vessel did return to the port of New York and discharge the merchandise, seriously damaged by contact with oil and water. A careful examination of that paper fails to disclose any charge of negligence attributable to the owners of the vessel. There is no allegation of unseaworthiness, and likewise there is no allegation of "unjustifiable" deviation. On the contrary, the answer alleges full compliance with the duty imposed on the vessel, her seaworthiness, and that her return to port was due to perils of the sea. It is true that in the replication filed by appellant denial of the seaworthiness of the ship is made, and the damage alleged to have occurred in consequence thereof. Conceding to the appellant, on a motion to dismiss his libel, every inference which may be fairly drawn from any allegation of the pleading, and treating the denial just above referred to as affirmative allegations of unseaworthiness and of damage caused thereby—to be considered and determined in the light of the other facts shown in the pleadings—we are brought to consider the two questions propounded above.

The bill of lading contained the usual clauses permitting the ship to call at any port or ports outside the customary route, to sail with or without pilots, to deviate for the purpose of saving life or property, to transship if prevented from proceeding on the voyage. and exempting the carrier from liability for the neglect or default of pilots, masters or crew in the navigation of the ship. There was also an exception of unseaworthiness, provided the owners have exercised due diligence, etc.

The Turret Crown, after putting to sea, encountered a storm, during which heavy seas repeatedly broke over her decks, seriously injuring the vessel and her equipment. Judge Ward, in the opinion filed by him in the New York case, a copy of which was submitted to us by both parties at the argument, held that the difficulties of navigation which the vessel encountered were due to a breakdown in her steering gear, and that this, in turn, was due to defective bolting of the steering engine, causing it to work loose on its foundation. He further found that these defects were discovered and pointed out in a survey held prior to the commencement of the voyage, and that the owners were negligent in failing to correct them. He likewise found, however, that the cause of the cargo damage was the water taken into the fuel tank through the bottom, and that this was not caused by the unseaworthiness of the vessel. If we accept, as we are disposed to do, his finding of the facts in this regard, it would seem to follow, of course,.

that, there being no causal relation between the unseaworthiness and the damage, no advantage may properly be taken of the former. But, whether this be true or not, the record distinctly shows that after the jamming and loosening of the steering gear so that it was unusable, the condition of the vessel made a continuation of the voyage unsafe, if not impossible. From time to time over three days, through the efforts of the engine room crew, repairs were made which permitted a temporary resumption of the voyage, but the remedy was of short duration, the trouble returned, and with the ship pitching and rolling heavily she was swung around in an effort to return to port, and this she was able to do only with the assistance of a revenue cutter, by which she was towed for nearly two weeks. That in this there was a deviation in the sense that the ship was deliberately turned from her regular and usual course is true, but this alone, we think, is not enough to deprive the carrier of the benefits of his contract and render the same void and of no effect. Such departure from her course must also have been voluntary, without necessity, or any reasonable cause. To hold otherwise would, we think, be equivalent to saying that any deviation from the pathway of the intended voyage, however necessary and whatever the exigencies, would of itself avoid and annul the contract; would enable the holder of the bill of lading, whose goods were in process of transportation, to insist upon release from his obligation to pay the agreed freight—even in a case of undamaged delivery—for any omission of the owner to furnish a seaworthy vessel, without regard to the question of how far, or if at all, such failure affected the change of course or deviation. We have been referred to no decision which, in our opinion, goes so far. The Malcolm Baxter (not reported) was, in our opinion, a wholly different case. There the negligence of the shipowner was the direct cause of the deviation and, as it subsequently turned out, of the frustration of the voyage. To determine that the freight money for the voyage thus terminated was not retainable by the shipowner is wholly different from the conclusion we are asked to reach in this case; nor do we think there is anything which sustains appellant's contention in the case of The Indrapura, 171 Fed. 929, on appeal (D. C.) 238 Fed. 853; or in the case of The Thessaloniki (C. C. A.) 267 Fed. 67. On the other hand, Judge Ward in the New York branch of this case, in an erudite and convincing opinion, maintains the opposite view; and the recent English cases in which the question has arisen likewise so hold. In Kish v. Taylor, a case in which the charterers of a vessel failed to deliver a full cargo, contrary to the provisions of the charter, the master of the vessel, to mitigate the damages, supplied the deficiency, but unfortunately so overloaded his vessel as to make her unseaworthy. She encountered bad weather, and by reason of her unseaworthiness the master was obliged, in order to save the vessel and the lives of his crew, to take refuge in the port of Halifax. Charterers thereupon denied liability, insisting they were released from the terms of the charter by reason of the deviation. Lord Atkinson, in deciding the case on appeal to the House of Lords (Kish v. Taylor, 12 Asp. Mar. Cas. 217) said on this point:

"* * * It is prima facie not only the right but the duty of the master of a ship to deviate from the course of his voyage and seek a harbor or place of safety, if that be reasonably necessary in order to save his ship and the lives of his crew from the perils which beset them."

And, again, he said:

"So that the question for decision, resolves itself into this: Is it the presence of the peril and not its cause which determines the character of the deviation, or must the master of every ship be left in this dilemma, that whenever, by his own culpable act, or a breach of contract by his owner, he finds his ship in a perilous position, he must continue on his voyage at all hazards, or only seek safety under the penalty of forfeiting the contract of affreightment? Nothing could, it would appear to me, tend more to increase the dangers to which life and property are exposed at sea than to hold that the law of England obliged the master of a merchant ship to choose between such alternatives."

We think this an admirable statement, not only of the law, but of the reason of the law. Bearing in mind that the deviation, if it occurs under such circumstances, releases the ship's owners from no obligation undertaken by them, and leaves the question of responsibility for damages to the cargo unchanged, it would, in our judgment, to hold otherwise, be to substitute for the enlightened viewpoint of the times a principle consonant only with the dark ages. In the instant case the owner of the Turret Crown may have been negligent in the exercise of that degree of care, in furnishing a seaworthy vessel, which the maritime law imposes. If it was, and damages resulted from this negligence—as to which we, of course, express no opinion—it was responsible, if the owners of the cargo had been diligent and prompt in the enforcement of their claim. But the return of the vessel to New York under the circumstances hereinbefore enumerated, adds nothing to their rights and takes nothing from them. It was an act of necessity, demanded alike by the laws of prudence and humanity. This being so, and the parties having contracted that their respective rights and liabilities shall be determined in accordance with the provisions incorporated into the bill of lading, it follows that the decree of the lower court should be, and is, affirmed with costs.

Affirmed.