**HARTFORD & NEW YORK TRANSP. CO. v. ROGERS & HUBBARD CO.**

**ROGERS & HUBBARD CO. v. HARTFORD & NEW YORK TRANSP. CO.**

Nos. 111, 112.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1931.

For opinion below, see 40 F.(2d) 954.

Single & Single, of New York City (Carroll Single and C. Welmore Robinson, both of New York City, of counsel), for appellant Rogers & Hubbard Co.

Haight, Smith, Griffin & Deming, of New York City (Wharton Poor and James McKown, Jr., both of New York City, of counsel), for appellee Hartford & N. Y. Transp. Co.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The Hartford & New York Transportation Company filed a libel against Rogers & Hubbard Company to recover general average charges, and the latter filed a cross-libel against the Hartford & New York Transportation Company for cargo damage. A decree was granted for general average charges in the first cause, and the libel was dismissed in the second cause.

The libelant Hartford & New York Transportation Company, operates tugs and barges carrying cargo from New York through Long Island Sound to points on the Connecticut river. Rogers & Hubbard, who were their customers, shipped 350 tons of nitrate of soda on libelant's Barge No. 18 under bills of lading, whereby they agreed to contribute in general average to any sacrifices or expenses that might be incurred for the common benefit. The Barge No. 18 left New York on April 15, 1926, in tow of libelant's tug Spartan, which was in command of Captain Brewer, who had for ten years navigated from New York up and down Long Island Sound and the Connecticut river.

The Spartan had five barges in tow, of which No. 18 was the last, as the tow went along the Sound toward the mouth of the Connecticut river. As it approached the entrance, the tug blew to the barges to shorten their hawsers, and, when this was done proceeded. The wind at this time had freshened and blew twenty-five to thirty knots from the southwest, so that the tugmaster reduced his speed in order to run no risk of parting a hawser. The tide was the first of the ebb, and there was a spring freshet of a height of thirteen feet running out of the Connecticut river. When about two or three hundred feet off the Saybrook Breakwater Light, the Spartan and her tow were caught in what was described as a "witch tide," which swept the tow to the eastward. The first two barges proceeded safely up the channel, but the third and fourth barges touched bottom. The last barge, No. 18, because of the slackening of the tow line between her and the fourth barge, was caught by the wind and tide and carried still farther to the eastward, struck bottom off the easterly Saybrook Breakwater, and parted her hawser. The cargo of nitrate was damaged, and a wrecking company was employed by the Hartford Company to release the barge, after which she was towed up the Connecticut river to her destination at the plant of Rogers & Hubbard. Each barge was equipped with two anchors, but the master of No. 18, in the short time between her loss of control owing to the slackening of her hawser and her grounding, hesitated to drop an anchor lest the barge, driven by the wind and drifting in the heavy sea, might be impaled on it, receive a hole in her bottom and sink. The hawser of No. 18 had been inspected before leaving New York and found in good condition. It had been in use for thirteen trips, and the life of such a hawser is from twenty to twenty-four.

Judge Thomas found that the libelant used due diligence to make the tug and barges seaworthy, and that they were properly manned, equipped, and supplied. He also found that the accident was due to no negligence, but to the unaccountable action of wind and tide. He accordingly granted a decree for general average contribution in accordance with the prayer of the libel, and dismissed the cross-libel filed to recover the cargo damage.

The appellant complains of the action of the court below because the libelant had not used due diligence to make the tug and barge seaworthy, for the reason that:

(a) The Spartan left New York when storm warnings were posted.

(b) The Spartan proceeded through Hell Gate with five barges, contrary to the regulations.

(c) There was a deficiency on the part of the Spartan's crew.

(d) The libelant should have had a helper tug in attendance at Saybrook.

It is quite clear that storm warnings had no bearing upon the issues here. The Weath-

er Bureau at Washington issued the following Bulletin the morning of April 15, 1926:

"April 15, 1926. Hoist northwest storm warning 9 A. M. and lower at Sunset, Virginia Capes to Boston, Mass. Strong northwest winds possibly of gale force at times today, diminishing tonight. Small craft warnings indicated north of Boston, April 16, 1926. No storm warnings issued for New York, N. Y., New Haven, Conn. and intervening points."

The Spartan had left Perth Amboy at 7:05 a. m. April 15, and had picked up the first of her five barges before the time designated for the hoisting of any storm warnings. She saw no storm warnings that morning or at any time and encountered no strong wind until she got within about six miles of Saybrook Breakwater the afternoon of April 16. The storm warnings indicated no gale in the Sound for April 16th, and the tow actually experienced none until a southwest wind of from twenty-five to thirty knots came up, after passing Crane Reef. The whole voyage was uneventful until the tow reached the Saybrook Breakwater, and the master of the Spartan had no reason to anticipate danger from gales either in entering or continuing upon his course. He testified that he would have sought refuge at Duck Island if he had thought there was reason to anticipate any risk of a storm before getting into the Connecticut river. We are satisfied that the Spartan was justified in starting out and proceeding with her tow, so far as the weather was concerned, and that the flotilla was not unseaworthy because of inability to cope with any storms which might reasonably have been anticipated at the commencement of the voyage.

 The contention that the tow was unseaworthy because it passed through Hell Gate with more than four barges, and thus violated the regulations of the War Department is hardly worthy of comment. These regulations not only could not have the slightest relation to the stranding at Saybrook, but they were made to prevent "interference with the operations of the United States in widening and deepening the channel at Middle Reef," and not to safeguard the public. Violation of such regulations can afford no basis for claims by third parties. St. Louis & San Francisco R. R. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290; Chicago Great Western R. R. Co. v. Schendel, 267 U. S. at page 291, 45 S. Ct. 303, 69 L. Ed. 614; The Michael Tracy (C. C. A.) 43 F.(2d) 965.

██ The contention that the flotilla was unseaworthy because the Spartan did not carry the necessary crew is also unsupported by the evidence.

The tug's certificate required a crew of ten men, which were to be five in the engine-room, together with the master and mate, two able seamen, and one seaman. The crew actually carried is said to have been deficient because it comprised but one able seaman. The certificate of the inspectors was issued under section 4463 of the Revised Statutes, as amended (46 USCA § 222), requiring such a complement as may in the judgment of the local inspectors be necessary for the safe navigation of the vessel. The certificate of the Spartan stated that, if the vessel is navigated not more than thirteen hours daily (which was not the case), a crew of six was sufficient. Failure to comply with the terms of the certificate would subject those responsible for the irregularity to penalties, but would not necessarily render the vessel unseaworthy. Seaworthiness in respect to the crew of a vessel depends on whether the personnel is competent to perform maritime services and not on certificates. The personnel in the present case was satisfactory. Arnould on Marine Insurance, §§ 722, 724 (11th Ed.); The Blue Bell (D. C.) 189 F. 824; The Abbazia (D. C.) 127 F. 495; In re Meyer (D. C.) 74 F. 881; McLanahan v. Universal Ins. Co., 1 Pet. at page 184, 7 L. Ed. 98; Louisville Ins. Co. v. Monarch, 99 Ky. 578, 36 S. W. 563; Remond v. Smith, 7 Man. & G. at page 475. The decision of the New York Court of Appeals in Smith v. Northwestern Ins. Co., 246 N. Y. 349, 159 N. E. 87, is not to the contrary. That was an action to recover upon an insurance policy on a lighter's cargo. The policy contained a warranty that she should be manned "according to the usage and custom." She sailed with a crew of four men, when six were required. It was held that "usage and custom" were not satisfied with less than the statutory requirements, and that failure to comply with them was a breach of warranty that barred recovery. It is quite a different matter to hold, irrespective of special covenants of warranty, that the failure of a single member of a crew to possess a statutory certificate rendered the vessel unseaworthy for all purposes, though the crew satisfactorily performed all the services required of it and was in fact entirely competent. Warren v. Manufacturers' Ins. Co., 13 Pick. (Mass.) 518, 25 Am. Dec. 341; Flanigen v. Washington Ins. Co., 7 Pa. 306. Appellant

admitted in its brief on appeal that there was no "evidence in the record of any mistake or error in navigation or management of the vessel." This would seem to show that seaworthiness in fact existed so that "due diligence to make the * * * vessel * * * seaworthy" was immaterial. The Indrani (C. C. A.) 177 F. 914.

But, even if the flotilla could be regarded as unseaworthy because of neglect to observe the regulations of the War Department in respect to towing more than four barges through Hell Gate, or because of failure of the Spartan to carry the precise crew called for by her certificate of inspection, these faults in no way contributed to the accident at the Saybrook Breakwater. A disregard of a statute or regulation does not make a vessel an outlaw and deprive her of the benefits of the Harter Act when her neglect has nothing to do with the cause of action which is asserted against her.

While it is contended that the Harter Act (46 USCA §§ 190–195) requires the owner to provide a ship that is in all respects seaworthy before he can take advantage of the exemptions under that act, this requirement affects only causes of action for damages *resulting* from unseaworthiness. It is not enough to displace the contract of affreightment and to deprive the vessel of the exemptions of the Harter Act that she was unseaworthy, if the damage was not caused by the unseaworthiness. The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; The Turret Crown (C. C. A.) 284 F. 439; The Turret Crown (D. C.) 282 F. 354; The Thessaloniki (C. C. A.) 267 F. 67. In view of the foregoing, the language of Judge Morris in The Willdomino (C. C. A.) 300 F. 5, at page 11, to the effect that a carrier is liable "wholly without regard to whether or not there was any causal connection between the lack of due diligence to make the ship seaworthy in all respects and the loss caused by the negligence in navigation or in the management of the vessel" cannot be regarded as in accord with the authorities.

The contention that the Spartan and her tow were not seaworthy because a helper tug was not kept in attendance at Saybrook is untenable. The testimony showed that tugs and tows constantly made the journey up the Sound and into the Connecticut river, both during spring freshets and at other times, without assistance and with entire success. There was no reason for anticipating danger on this occasion. The wind came up suddenly when near Saybrook. The accident was either due to an error of navigation, which appellant disclaims, or to unforeseeable interaction of wind, tide, and spring freshets, which was a "danger of the sea," as to each of which the Harter Act afforded exemption from liability. We hold that the peculiar action of the elements which occasioned the damage in this case was a "peril of the sea" within the rules laid down in numerous decisions. The Warren Adams (C. C. A.) 74 F. at page 413; The Frey (C. C. A.) 106 F. 319, at page 324; The Giulia (C. C. A.) 218 F. 744, at page 746; Duche v. Brocklebank (C. C. A.) 40 F.(2d) 418, 419. Not a single witness testified that any conditions at Saybrook which might have been anticipated necessitated a helper tug, and the Hartford Company had constantly had a single tug perform the service with impunity.

The trial court properly disposed of the issues before it, and the decrees in respect to the libel and cross-libel are affirmed.